IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| REGINA JACKSON AND RUDOLF WILLIAMSON, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF RACHEL JACKSON, DECEASED<br>*Plaintiffs*,<br><br>v.<br><br>JOHN S. FORD, M.D., AND TRAVIS COUNTY, TEXAS<br>*Defendants*. | § § § § § § § § § § § § § | CA NO.  A 10 CA 522 SS |

### DEFENDANT JOHN FORD, M.D.'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

COMES NOW John Ford, M.D. ("Dr. Ford"), by and through counsel, and respectfully moves this Court for summary judgment pursuant to FED. R. CIV. P. 56 on each of Plaintiff's claims, and would respectfully show the following:

### I. BACKGROUND

Plaintiffs Regina Jackson and Rudolf Williamson are the alleged biological parents of Rachel Jackson, an inmate of the Travis County Correctional Complex ("TCCC") who died in custody on July 21, 2008. **[Dkt. 1, p. 1]**. Rachel Jackson had a history of mental illness, and was experiencing uncontrolled psychosis when taken into custody on July 15, 2008. **[Dkt. 1, p. 3]**. Dr. Ford was an independent contractor physician who practiced psychiatry at the TCCC. It is undisputed Dr. Ford saw and treated the patient on numerous occasions while she was incarcerated between July 15, 2008 and July 21, 2008. **[Dkt. 1, p. 3-4]**. The Medical Examiner's Report pointed to multiple potential causes of death, and listed the manner of death as "natural."

In the present lawsuit, Plaintiffs have alleged Dr. Ford and Travis County violated the

Eighth and Fourteenth Amendments under 42 U.S.C.A. § 1983 by being deliberately indifferent to substantial risks of serious harm to inmate Rachel Jackson, and Plaintiffs have further alleged Dr. Ford committed common law medical negligence. **[Dkt. 1, p. 6-9]**. Specifically, and boiled down to its lowest common thread, Plaintiffs have alleged Dr. Ford prescribed thioridazine (a/k/a Mellaril) to Rachel Jackson when he should not have. **[Dkt. 1, p. 7]**. Defendant Ford has denied he violated Rachel Jackson's constitutional rights, denied he acted negligently, and further asserted one or more affirmative defenses including, but not limited to qualified immunity from suit. **[Dkt. 5, pp. 2, 7][Exhibit A]**.

## II. STANDARD OF REVIEW

FRCP 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence fo an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party [must] go beyond the pleadings and by his/her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 327.

## III. ARGUMENT & AUTHORITIES

A. **The Evidence Conclusively Establishes Defendant Ford Was Not Deliberately Indifferent to the Serious Medical Needs of Rachel Jackson as Required to Sustain a Claim by Plaintiffs Under 42 USC § 1983**

A pre-trial detainee's constitutional rights to medical care under the Due Process Clause of the Fourteenth Amendment are violated only if a physician demonstrates deliberate indifference to the serious medical needs of the patient. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Thompson v. Uphshur County, Texas*, 245 F.3d 447, 457 (5th Cir. 2001). Deliberate indifference, in this context means

that: (1) the physician was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the physician actually drew that inference; and (3) the physician's response indicates he subjectively intended that harm to occur. *Thompson,* 245 F.3d at 458-59. Deliberate indifference cannot be inferred from a negligent or even grossly negligent response to a substantial risk of harm. *Id.* at 459.

**Under an Eighth Amendment analysis, deliberate indifference is an extremely high standard to meet.** *Gobert,* 463 F.3d 339 (Emphasis added). Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment when they demonstrate deliberate indifference to a prisoner's serious medical needs. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *Id.* at 346. Unsuccessful medical treatments, negligence and medical malpractice are insufficient to give rise to a successful claim of deliberate indifference to serious medical needs." *Id.* **In order to prevail, a plaintiff must establish the defendant refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."** *Id. (Emphasis added).*

In the present case, the evidence is clear Dr. Ford did not act with deliberate indifference to the needs of Rachel Jackson. Dr. Ford examined the patient every weekday she was at the jail between July 15-18 (which is unusual in a jail setting), diagnosed her with schizo-affective disorder, prescribed multiple psychiatric medications to the patient in varying dosages during her stay, and made housing assignment changes based upon her needs. [Exhibit A] [Dkt 1, pp. 3-4, 6]. Each of these actions by Dr. Ford, even taken singularly, is evidence to rebut an allegation of deliberate indifference. *See Gobert,* 463 F.3d at 346 n 24. Dr. Ford originally prescribed Ms. Jackson the relatively new anti-psychotics Aripiprazole and Risperadone on July 15, 2008 based

upon her prior success with these medications. **[Exhibit A] [Dkt 1, pp. 3-4]**. Nevertheless, Ms. Jackson continued to experience bouts of aggression, violence and lack of sleep during her tenure on these medications. **[Exhibit A]**.

During the early morning hours of July 18, 2008, the TCCC jail records reflect Ms. Jackson complained to a jail guard her heart was racing. **[Exhibit A] [Dkt 1, p. 4]**. Dr. Ford has testified, and it is undisputed by any competent evidence, that Dr. Ford was never notified of this potential cardiac complaint by either the TCCC jail staff or the patient herself. **[Exhibit A] [Deposition of Priscilla Ray, M.D., pp. 64, 67-68]**. As such, without knowledge of the patient's alleged racing heart on the morning of July 18, 2008, and without knowledge of the Breckenridge lab results demonstrating borderline low potassium on July 15, Dr. Ford made a medication adjustment on the afternoon of July 18, 2008 to add a 100mg low dose of an older/more conventional anti-psychotic known as Thioridazine (Mellaril) in an effort to calm the patient and to assist the patient's sleep patterns. **[Exhibit A] [Dkt. 1, p. 4] [Deposition of Priscilla Ray, M.D., p. 53-54, 77]**. Although Dr. Ford was aware of Mellaril's unquantified potential to prolong a patient's QTc interval on EKG (as with most every anti-psychotic medication), it is undisputed he weighed the risk/benefits of adding this new medication, and believed Mellaril was safe based upon the patient's lack of relevant cardiac problems and his own 40+ year experience of having no adverse cardiac consequences with the drug. **[Exhibit A] [Deposition of Priscilla Ray, M.D., pp. 201-202, 204-205]**.

Thereafter, on Saturday July 19, 2008, the jail records reflect Ms. Jackson again complained to the jail nursing staff that her chest was hurting, and she was having difficulty breathing in her cell. **[Exhibit A] [Dkt 1, p. 4]**. Once again, the evidence is undisputed the TCCC jail and/or nursing staff did not notify Dr. Ford of the patient's potential cardiac complaints, and thus Dr. Ford had no knowledge of the patient's potential adverse medication

side effects, if any. **[Exhibit A] [Deposition of Priscilla Ray, M.D., pp. 64, 67-68]**. Dr. Ford has testified that had he been made aware of one or more of the patient's complaints on July 18 or 19, he would have ordered an EKG, taken electrolyte levels, and possibly halted the medications in question. **[Exhibit A]**. Instead, Dr. Ford was not contacted by anyone at TCCC at any time between writing his prescription for Mellaril on Friday, July 18, 2008 and the patient's eventual death on July 21, 2008. **[Exhibit A]**.

In regard to Dr. Ford's prescription for Mellaril, Plaintiff's liability expert Priscilla Ray, M.D. initially opined Dr. Ford breached the standard of care and/or demonstrated deliberate indifference by failing to order an EKG and/or serum electrolyte levels for the patient. However, her sworn testimony demonstrates the impropriety of such ultimate conclusions. Dr. Ray acknowledged Dr. Ford had no reason to be aware of the patient's Breckenridge potassium levels, nor should Dr. Ford have been aware of any prior cardiac conditions and/or family history in that regard. **[Deposition of Priscilla Ray, M.D., pp. 53-54, 70]**. Dr. Ray acknowledged Dr. Ford had no reason to know of any chest complaints lodged by the patient during her stay at TCCC. **[Deposition of Priscilla Ray, M.D., pp. 64, 67-68]**. Although Dr. Ray believed an EKG and/or electrolyte level should have been performed by Dr. Ford prior to instituting Mellaril, she further admitted she had no evidence the patient's EKG or electrolyte levels would have been abnormal at any time after Ms. Jackson entered TCCC, and therefore she would be unable to show Dr. Ford's failure to order such testing was a proximate cause of the patient's ultimate demise. **[Deposition of Priscilla Ray, M.D., pp. 54-55, 58-59]**.

Interestingly, despite her stated desire for an EKG and/or serum electrolyte levels, Dr. Ray testified repeatedly Dr. Ford did not breach the applicable standard of care in prescribing Mellaril to Ms. Jackson, and she further acknowledged his prescription for Mellaril was not absolutely contraindicated in this patient. **[Deposition of Priscilla Ray, M.D., pp. 75, 183]**. She

acknowledged she had never personally had a patient die of a cardiac arrhythmia while taking Mellaril, and noted she similarly had no evidence to dispute Dr. Ford's testimony that he had never seen such a result in his patients either. **[Deposition of Priscilla Ray, M.D., pp. 79-80].**

Indeed, despite claiming deliberate indifference on the part of Dr. Ford, Dr. Ray subsequently testified the standard of care does not always require a physician to order an EKG and/or electrolyte level for a patient before beginning Mellaril. **[Deposition of Priscilla Ray, M.D., p. 78].** Dr. Ray acknowledged the manufacturer's literature for Mellaril specifically states no causal relationship has been established between Mellaril and fatal arrhythmias. **[Deposition of Priscilla Ray, M.D., p. 187, 189-190].** As such, despite previously testifying Dr. Ford was acting deliberately indifferent for failing to order an EKG and/or electrolyte testing, Dr. Ray conceded neither the Mellaril manufacturer nor the FDA had placed an absolute contraindication on physicians prescribing Mellaril without ordering such tests. **[Deposition of Priscilla Ray, M.D., pp. 200-202].** As such, she ultimately acknowledged there was no more than a relative contraindication in failing to order such tests, and that such relative contraindication required a physician to weigh the risks and benefits of his course of treatment. **[Deposition of Priscilla Ray, M.D., pp.200-202, 204].**

Lastly, Dr. Ray acknowledged Dr. Ford had indeed weighed the risks and benefits of his course of treatment before beginning Ms. Jackson on Mellaril. **[Deposition of Priscilla Ray, M.D., p. 202].** As such, because Dr. Ford had weighed the risks and benefits of his course of treatment for this individual patient before prescribing Mellaril, Dr. Ray acknowledged Dr. Ford had "by definition" not deliberately disregarded the risks of serious harm to the patient. **[Deposition of Priscilla Ray, M.D., p. 205].** Dr. Ray ultimately agreed bad results could occur even after a physician weighs the risks and benefits of a particular treatment, and ultimately, that is what occurred in the present case. **[Deposition of Priscilla Ray, M.D., pp. 204-205].**

As such, the evidence conclusively establishes Dr. Ford did not act with deliberate indifference to the serious medical needs of Rachel Jackson. The evidence further conclusively establishes no action or omission by Dr. Ford was a proximate cause of Plaintiff's ultimate injury such that 42 USCA § 1983 would be applicable.

B.  **The Evidence Conclusively Establishes Plaintiffs Failed to Timely File an Expert Report Pursuant to Texas Civil Practice & Remedies Code § 74.351 and Thus Plaintiffs' Medical Negligence Claims Should Be Dismissed**

In their Original Complaint, Plaintiffs have alleged Dr. Ford committed "Medical Negligence" and/or gross negligence by breaching undefined applicable standards which proximately caused damages to Rachel Jackson. **[Dkt. 1, pp. 9-10]**. Moreover, Plaintiffs' Original Complaint alleges Plaintiffs' counsel has recognized the applicability of, and complied with, the pre-suit notice provisions of Texas Civil Practice & Remedies Code Chapter 74. **[Dkt. 1, p. 2]**. As such, Plaintiffs have alleged a healthcare liability claim against Dr. Ford allegedly cognizable under Texas state law generally, and Texas Civil Practice & Remedies Code Chapter 74 specifically.

Pursuant to Texas Civil Practice & Remedies Code § 74.351,

>  (a)  *In a healthcare liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. . . .*
>
>  (b)  *If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:*
>
>>  (1)  *awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and*

>  (2)  *dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.*

Plaintiffs' Original Complaint was filed against Dr. Ford on or about July 14, 2010. **[Dkt. 1].** One hundred twenty days after the filing of Plaintiffs' Original Complaint was the date of November 11, 2010. It is undisputed Plaintiffs failed to file a preliminary expert report consistent with the statutory requirements of Texas Civil Practice & Remedies Code § 74.351 at any time on or before November 11, 2010.

Unlike the prior health care liability statute Article 4590i, Chapter 74 does not provide the Court with discretion to grant an extension or grace period in circumstances, such as the present case, in which the Plaintiff wholly fails to tender any expert report or curriculum vitae within the 120 day reporting deadline. Instead, the dismissal requirements of TEXAS CIVIL PRACTICE & REMEDIES CODE § 74.351(b) are mandatory when no expert report or curriculum vitae has been tendered within 120 days of filing suit. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(b)(2); *Valley Baptist Medical Ctr. v. Azua,* 198 S.W.3d 810 (Tex. App. – Corpus Christi 2006, no pet.); *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 853 (Tex. App.-Texarkana 2006, no pet.).

While various federal cases would seem to indicate the requirements of Chapter 74 are procedural, and therefore not binding on the federal courts, these findings each discuss federal courts with diversity jurisdiction. *See Guzman v. Mem'l Hermann Hosp. Sys.,* 2008 U.S. Dist. LEXIS 101781 (S.D. Tex. Dec. 17, 2008). In diversity cases, it seems logical that Texas procedural rules would not be binding on an out-of-state defendant.

By contrast, the Fifth Circuit has recently found applicable and applied the reporting requirements of Texas Civil Practice & Remedies Code Chapter 74 when jurisdiction stems from a federal question and/or federal tort claims act case. *See Chapman v. United States of America,*

353 Fed. Appx. 911 (5th Cir. 2009)(Not Designated for Publication). "As [Plaintiff] is claiming that the Government departed from 'accepted standards of medical care' that proximately resulted in his injury, he was required to file an expert report in this case." *Chapman,* at 913-14. The Fifth Circuit dismissed Chapman's claim accordingly due to his failure to file a timely Chapter 74 report.

As such, Dr. Ford would respectfully request the Court find Plaintiffs herein have failed to timely produce a preliminary expert report pursuant to Texas Civil Practice & Remedies Code § 74.351, and thus dismissal of their Medical Negligence claim is appropriate.

C.  **No Evidence of Medical Negligence**

Pleading in the alternative, Dr. Ford would allege Plaintiffs have no evidence Dr. Ford breached any applicable standard of care, nor that any such breach was a proximate cause of damages to Rachel Jackson and/or Plaintiffs herein.

D.  **Dr. Ford Has Qualified Immunity from Suit**

In his Original Answer, Dr. Ford alleged he was entitled to qualified immunity from suit herein. **[Dkt. 5, p. 7].** The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation. *Manis v. Lawson,* 585 f.3d 839, 843 (5th Cir. 2009). A court may rely upon either prong of the defense in its analysis. *Id.* If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were "objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir. 2004). To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates the right. *Brown v. Miller,* 519 F.3d 231, 236 (5th Cir. 2008). The unlawfulness of the defendant's actions must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact acts have been illegal. *Id.* at 236-37.

Dr. Ford has testified he was a board-certified psychiatrist acting under contract for the Travis County Correctional Complex. **[Exhibit A].** A private doctor under contract with a state prison to provide medical care to prisoners is considered a state actor because his action in providing medical care to prisoners is fairly attributable to the state. *See West v. Atkins,* 487 U.S. 42, 49-50, 54-57 (1988); *Bishop v. Karney,* 408 Fed. Appx. 846, 848 (5th Cir. 2011)(Not designated for publication).

As set forth in Exhibits A and B attached hereto, the actions and omissions of Dr. Ford herein did not violate a constitutional right of the plaintiff which was clearly established at the time of the act. The testimony of Plaintiff's expert Priscilla Ray cited herein demonstrates Dr. Ford provided timely medical care to Rachel Jackson, and sufficiently weighed the risks and benefits of his actions before beginning his course of treatment. **[Deposition of Priscilla Ray, M.D., pp. 202, 204-05].** Dr. Ford took no action in violation of Rachel Jackson's constitutional rights, or alternatively, failed to realize he was acting in violation of her rights. **[Exhibit A].**

As such, Dr. Ford hereby moves for dismissal of each of Plaintiff's claims based upon his qualified immunity herein.

Respectfully submitted,

**GERMER GERTZ BEAMAN & BROWN, LLP**
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 (Telecopy)

By: _____
Paul Byron Starr
State Bar No. 24004934

**LEAD ATTORNEY FOR DEFENDANT
JOHN FORD, M.D.**


### CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by certified mail, return receipt requested, facsimile or regular mail on October 3, 2011, as follows:

Sean M. Lyons
HENDERLAW, P.C.
1301 W. 25th Street, #400
Austin, Texas 78705
Telephone: (512) 439-3200
COUNSEL FOR REGINA JACKSON
AND RUDOLF WILLIAMSON

Elaine A. Casas
Jennifer Kraber
TRAVIS COUNTY ATTORNEY
P.O. Box 1748
Austin, Texas 78767-1748
Telephone: (512) 854-9415
COUNSEL FOR TRAVIS COUNTY

_____
Paul Byron Starr