## AFFIDAVIT OF JOHN S. FORD, M.D.

1. "My name is John S. Ford, M.D., and I am a physician licensed by the Texas Medical Board. I am over the age of 18, have never been convicted of a felony or crime of moral turpitude, and am in all ways competent to make this report. The facts stated herein are just, true and correct, and within my personal knowledge."

2. "I am a board-certified psychiatrist who has been licensed to practice in Texas since 1966 (45 years). I graduated from medical school at the University of Texas Medical Branch, and completed my internship and residency in Psychiatry at the same facility. I was in the private practice of psychiatry in Clear Lake, Texas between 1972-85, and served as the Medical Director for Pinewood Hospital in 1986. After resigning my position there, I continued the private practice of Psychiatry until moving to Austin in 2002. From 2002-2010, I served as the jail psychiatrist at the Travis County Correctional Complex (TCCC) in Del Valle, Texas."

3. "In reaching my opinions in this case, I have reviewed the following (a) medical, jail, and post-death records from the TCCC, (b) the autopsy and investigation records of the Travis County Medical Examiner, and (c) the medical records from Breckenridge Hospital."

4. "My review of the records demonstrates Rachel Jackson had a history of incarcerations prior to her arrest on July 15, 2008, and had a medical history of mental health treatment for varying psychiatric diagnoses including bipolar disorder, schizo-affective disorder, cannabis abuse, and schizophrenia at numerous locations. She was arrested in the early morning hours of July 15, 2008 high on PCP and/or 'wet,' and was transported to the Breckenridge Hospital ER before being booked at the TCCC. I ordered the Breckenridge records at that time, but did not receive such records nor learn of the patient's low potassium/sodium levels at any time before the patient's death."

5. "Upon arrival at the TCCC on the morning of July 15, 2008, the patient was reported to be acting intoxicated and agitated, and I ordered she be placed into a 'slick cell' (for suicide observation and prevention) for her own protection. I saw the patient on July 15, 16, 17 and 18, and documented medical records for each of these visits. On July 15, I prescribed the newer atypical antipsychotic medications Abilify and Risperdal to the patient; however, the records reflect the patient continued to be agitated, violent to guards and dysfunctional in her cell throughout July 15-17. As a result of the clinical ineffectiveness of these antipsychotic medications, and in order to more effectively treat the patient's significant sleep disturbances, I subsequently added a low dose of Mellaril (Thioridazine) to the patient's regimen on July 18. It was my intention to begin weaning the patient off of Abilify and/or Risperdal following the introduction of the Mellaril. Per correctional health records, the patient reportedly received a dose of Mellaril at bedtime on July 18, 19 and 20."

6. "The jail records reflect the patient apparently complained to a jail guard of a rapid heartbeat during the early morning hours of July 18. This information was not relayed verbally or in writing to me, nor was this information placed into the patient's medical chart. Indeed, the patient made no similar complaint to me a few hours later during her appointment. The jail records reflect the patient similarly complained to jail staff of chest pain, anxiety and a rapid heartbeat at some point on July 19; however, once again, I was not ever made aware of these complaints. If the TCCC jail staff had made me aware of the patient's cardiac complaints, I would have taken affirmative action such as ordering an EKG, holding the patient's medications, or ordering electrolyte levels."



EXHIBIT A

7. "It is my professional opinion that my evaluation, care and treatment of patient Rachel Jackson met all applicable standards of care for a psychiatrist practicing in a correctional institution setting. Ms. Jackson had dual diagnoses of chronic mental illness and extensive poly-substance abuse necessitating probation involvement and court-ordered group-home treatment. Based upon the patient's history and treatment resistant/refractory illness, it was reasonable to place the patient on Abilify and/or Risperdal on July 15, 2008, and to maintain the patient on such medications during her incarceration, as these medications, alone or in combination, are routinely utilized for the treatment of schizoaffective disorder."

8. "The patient's course at the TCCC led me to reasonably conclude the doses of Abilify and/or Risperdal were not necessarily therapeutic for the patient, and thus I believed it reasonable to try a relatively low dose of the conventional anti-psychotic medication Mellaril on July 18, 2008. It was my intention to wean the patient off one or more of her other medications over the ensuing days/weeks, and this too was reasonable, as stopping an anti-psychotic medication abruptly can have very serious short and long term effects."

9. "It is my opinion I complied with the standard of care and black box warning of Mellaril by ensuring the patient had attempted at least two other anti-psychotic medications prior to her prescription. I have prescribed Mellaril to numerous patients for 40+ years without any adverse cardiac consequences, and did not believe Ms. Jackson fit into a category of patients for whom I would have cardiac concerns. Specifically, I had no knowledge Ms. Jackson had low potassium levels or sodium levels at Breckenridge on July 15, nor was I made aware of any post-incarceration cardiac complaints by the jail staff. I similarly was not aware of any EKG irregularities with the patient, nor do I believe she had any."

10. I was aware of the Mellaril literature (as with most other medications) regarding potential cardiac consequences, and reasonably weighed such consequences utilizing an individualized risk to benefit ratio analysis in making my decision to prescribe Mellaril for this patient. Moreover, in a correctional setting, and especially in a short-term jail detention setting, it is typically very difficult to obtain all potential monitoring and/or testing that is more easily available or obtained in a private hospital or outpatient setting, and thus the ultimate decision as to whether to order testing such as an EKG and/or serum electrolyte levels was reasonably weighed prior to prescribing Mellaril in this case."

11. "I did not act with deliberate indifference to the rights of Ms. Jackson in this case. I did not refuse to treat her, ignore her known complaints, intentionally treat her improperly, nor otherwise act in a manner adverse to the medical needs of the patient."

*John Ford, M.D.*
John Ford, M.D.

Sworn to and subscribed before me, a Notary Public, on this 3rd day of October, 2011.

*Sara K. Looney*
Notary Public, State of Texas

SARA KATHLENE LOONEY
Notary Public, State of Texas
My Commission Expires
November 09, 2013