IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

REGINA JACKSON AND RUDOLF WILLIAMSON, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF RACHEL JACKSON, DECEASED,
Plaintiffs,

VS. : CA NO. A 10 CA 522 22

JOHN S. FORD, M.D., AND TRAVIS COUNTY, TEXAS,
Defendants.

ORAL AND VIDEOTAPED DEPOSITION OF PRISCILLA RAY, M.D.
JULY 22, 2011

ORAL AND VIDEOTAPED DEPOSITION OF PRISCILLA RAY, M.D., produced as a witness at the instance of the Defendant John Ford, M.D., and duly sworn, was taken in the above-styled and numbered cause on Friday, July 22, 2011, from 11:25 a.m. to 4:23 p.m., before Mary C. Dopico, Certified Shorthand Reporter No. 463 and Notary Public in and for the State of Texas, reported by machine shorthand and audio/video recording at the offices of Germer Gertz, Three Allen Center, 333 Clay, Suite 4950, Houston, Texas, pursuant to Notice and the Federal of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

A P P E A R A N C E S

COUNSEL FOR PLAINTIFFS:
Mr. Sean M. Lyons
Hendersonlaw, P.C.
1301 W. 25th Street, Suite 400
Austin, Texas 78705
Telephone: 512/439-3200 Fax: 512/439-3201
E-mail: slyons@hendlerlaw.com

COUNSEL FOR DEFENDANT JOHN S. FORD, M.D.:
Mr. Paul Byron Starr
Germer Gertz Beaman & Brown, LLP
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone: 512/472-0288 Fax: 512/472-0721
E-mail: pstarr@germer-austin.com

COUNSEL FOR DEFENDANT TRAVIS COUNTY, TEXAS:
Ms. Elaine A. Casas
Ms. Jennifer Kraber
Travis County Attorney
314 West 11th Street
Granger Building, Suite 420
Austin, Texas 78701
Telephone: 512/854-9513 Fax: 512/854-4808
E-mail: elaine.casas@co.travis.tx.us
jennifer.kraber@co.travis.tx.us

REPORTED BY: Mary C. Dopico, CSR, RPR, CRR
VIDEO BY: Richard Rienstra
Independent Contractor To:
Wright, Watson & Associates
Firm Registration No. 225
Expires 12-31-2011
3307 Northland Drive, Suite 185
Austin, Texas 78731
512/474-4363 Fax 512/474-8802

INDEX
ORAL AND VIDEOTAPED DEPOSITION OF PRISCILLA RAY, M.D.
JULY 22, 2011

PAGE
Appearances........................................ 2
Proceedings/Stipulations........................... 6
Changes and Signature Page......................... 215
Reporter's Certification........................... 217

PRISCILLA RAY, M.D.

Examination, by Mr. Starr..................... 6
Examination, by Ms. Casas..................... 82
Examination, by Mr. Lyons..................... 177
Further Examination, by Mr. Starr............. 183
Further Examination, by Ms. Casas............. 209
Further Examination, by Mr. Lyons............. 210

RAY EXHIBITS
Exhibit 1.......................................... 16
Curriculum Vitae Revised 10-30-09 and list of Legal Fees (5 pages)

Exhibit 2.......................................... 28
Forensic Psychiatric Examination (6 pages)

Exhibit 3.......................................... 18
ABPN verifyCERT (1 page)

Exhibit 4.......................................... 28
List of testimony Revised 06-07-09 (2 pages)

Exhibit 5.......................................... 34
07-07-2000 FDA Dear Doctor letter regarding Mellaril (thioridazine HCL) (2 pages)

RAY EXHIBITS (CONT'D.) PAGE
Exhibit 6.......................................... 34
New FDA Warning about fatal risk lined to Melaril after 40 years (1 page)
08-18-2000 Psychiatric News FDA Approves New Warnings for Thioridazine, Valproate (2 pages)
Thioridazine Official FDA information, side effects and uses (4 pages)

Exhibit 7.......................................... 62
Documentation of visual observations, including all unusual, pertinent and clinical events for 7/16 1609 through 07/18 1345 (2450125 - 2450127

Exhibit 8.......................................... 62
Open Psych Status Notes (2450136)

Exhibit 9.......................................... 86
Curriculum Vitae Revised 12/04 (4 pages)

Exhibit 10......................................... 186
Novartis manufacturer's literature for Mellaril and Mellaril-S (15 pages)

Exhibit 11......................................... 191
11/1996 Clinical Pharmacology & Therapeutics article, "Concentration-related pharmacodynamic effects of thioridazine and its metabolites in humans" (13 pages)

Exhibit 12......................................... 191
03/1991 Clinical Pharmacology & Therapeutics article, "Plasma levels of thioridazine and metabolites are influenced by the debrisoquin hydroxylation phenotype" (8 pages)

RAY EXHIBITS (CONT'D.) PAGE
Exhibit 13......................................... 191
12/1999 Clinical Psychopharmacology article, "Pharmacokinetic Interaction of Fluvoxamine and Thioridazine in Schizophrenic Patients" (7 pages)

Exhibit 14......................................... 210
CD labeled Hendlerlaw, P.C., Jackson Medical Records from Travis County with Post-It on case stating "Autopsy Investigation Report"

Exhibit 15......................................... 210
CD labeled Jackson v. Travis County Discovery Documents with Post-It on case stating "Public Information Deaths in Jail"

REQUEST FOR INFORMATION/PRODUCTION................. 126
Information regarding alleged malpractice suit from the mid-Nineties

VIDEOTAPE INDEX
Tape 1............................................ 6
Tape 2............................................ 65
Tape 3............................................ 136
Tape 4............................................ 191

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1



6

P R O C E E D I N G S

(Ray Exbs. Nos. 1 and 2 were marked.)
THE VIDEOGRAPHER: We're on the record July 22nd, 2011, at 11:25 a.m. This is the beginning of tape number 1.
Would counsel like to identify themselves for the record?
MR. STARR: We'll waive that.
THE VIDEOGRAPHER: Will the court reporter please swear in the witness.
(The witness was sworn.)
THE REPORTER: Any stipulations?
MR. STARR: By the Rules, I guess.
MR. LYONS: Agreed.

PRISCILLA RAY, M.D.,
having first been duly sworn, testified as follows:

EXAMINATION

BY MR. STARR:
Q. Would you please state your name for the record?
**A. Priscilla Ray.**

7

[redacted]

8

[redacted]

9

Q. Have you -- You have been retained in this case by Attorney Sean Lyons and his law firm; is that correct?
**A. That's correct.**
Q. And have you ever worked with Mr. Lyons before?
**A. No.**
Q. Do you know how Mr. Lyons got your name?
**A. I believe so.**
Q. Tell me about that.
**A. I believe he was referred to me by Dr. Bill Reed.**
Q. And is that the Bill Reed that is now a retiring psychiatrist that lives in the Marble Falls, Texas area?
**A. I know he's in the Marble Falls area. I know he's a psychiatrist. I didn't know he was retiring.**
Q. Okay. I've taken his deposition a couple times.
**A. All right.**
Q. So, he -- I, in fact, have been to his house on Horseshoe Bay.
Do you know how Dr. Reed became involved in reviewing this case?
**A. That I don't know.**

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

10

11

now what that amount is?

Q. Okay. In reviewing and testifying in this case, you're charging the sum of $600 per hour; is that correct?

**A. That's correct. Yes.**

Q. And you would agree that is well above -- at least double, if not more so, your normal hourly rate for actually providing psychiatric services?

**A. It's above -- It's twice my normal rate.**

12

any of the lawsuits in which you have testified or been involved in, to your knowledge, has any opposing counsel ever filed a motion to challenge either your qualifications or the scientific reliability of your opinions?

**A. I don't -- Not -- No motion that I know of. They frequently question me about it in deposition or in trial.**

Q. And I guess a similar question is: To your knowledge, have you ever been stricken from testifying by the judge in any of the matters in which you've testified?

**A. Yes. Once.**

Q. Okay. And do you recall what case that was?

**A. That was in the State versus Clara Harris.**

Q. And to the extent you know, do you know why you were disqualified from testifying in that case?

**A. I wasn't privy to all of the discussion, though I could overhear some from the witness stand; and it sounded as if -- although no one ever told me -- it sounded as if the judge thought that the attorney should have gotten a signed consent form from her for me to testify.**

Q. Okay. And so in that case you were giving testimony about a patient you had treated, and the

13

allegation was the patient hadn't consented to you telling about her condition; and, therefore, you couldn't.

**A. That's the best of my understanding.**

Q. Okay.

**A. Yes.**

Q. Any other cases that you know of where your testimony has been stricken by the Court?

MR. LYONS: Objection -- sorry -- misstates the previous testimony.

Q. (By Mr. Starr) Yeah. Let me ask another question.

Are there any cases in which you know of where you have been disallowed to give expert testimony based upon your qualifications or scientific reliability?

**A. None that I know of.**

Q. Okay. I assume I know the answer to this; but at any time before giving your testimony today, did you ever meet Rachel Jackson?

**A. No.**

Q. Have you ever met Regina Jackson, the mother of Rachel Jackson?

**A. Not to my knowledge, no.**

Q. And as far as you know, have you ever met

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1



26

28

Q. Okay. Since 1958, have you done any type of work for a correctional facility?

**A. No.**

Q. Have you ever been employed or received training as a nurse, whether R.N., L.V.N., anything of that nature?

**A. No.**

Q. Have you ever worked as a peace officer?

**A. No.**

27

29

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D.
July 22, 2011

34

36

35

37

Q. So as we sit here today, you do not intend to give testimony either today or at the time of trial about the cause of Rachel Jackson's death; is that a correct statement?

**A. That's correct, unless you ask me what Dr. Dolinak's opinion was.**

Wright Watson and Associates, L.L.C.
512-474-4363

10 (Pages 34 to 37)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

70

[redacted]

71

[redacted]

Q. Have you ever prescribed Mellaril in your practice of psychiatry?
**A. I have.**
Q. When was the last time?
**A. It's probably been over a year.**
Q. As far as you know, do you have any patients you are currently treating that are taking Mellaril at your prescription?
**A. No, I don't think I do.**
Q. Over the 30-plus years of your professional practice, have you treated numerous psychiatric patients with Mellaril?
**A. I have.**
Q. Can you tell me, I guess, what are the benefits of Mellaril over other -- and I want to speak as of today's date. I know that there are later psychiatric drugs which have come about, such as Abilify and others.

72

**A. Uh-huh.**
Q. In your opinion, does Mellaril still have any utility over some of the newer drugs?
**A. Probably inpatient adherence in terms of patients that have been on it and are willing to be compliant with Mellaril when they wouldn't be with something else, but that's pretty limited.**
Q. Okay. Other than that, any other ben -- well, I guess let me just answer this.
What are the benefits of Mellaril treatment? What is in theory it supposed to remedy?
**A. Well, Mellaril's primarily indicated for treatment of psychosis. Specifically, schizophrenia has probably been its biggest use. It had the advantage of low extrapyramidal symptoms, side effects, so less restlessness, tremor.**
**It had some anti-depressant effect because of its more tricyclic appearing nature, its structure. So it was thought to confer a little bit of anti-depressant effect. It was sedating. So it was used to -- for sedation at night, frequently, in patients that are psychotic presumably.**
**So those are the advantages. Its advantages at that time were primarily compared to other in the older antipsychotic classes.**

73

Q. Okay. And you've indicated it is still a medication that psychiatrists such as yourself continue to order for particular patients in certain circumstances?
**A. Yes. I'd say you're going to be harder and harder pressed to find somebody that prescribes Mellaril.**
Q. And would you typically say -- and I mean no disrespect -- that it's probably the psychiatrists who have been in practice 20-plus years who have had experience with Mellaril and may still be prescribing it versus the younger pups just coming out of medical school?
**A. I think that's fair. I don't think any of the psychiatrists trained since probably 2000 would -- you'd find prescribing Mellaril. So many of them don't even know what it is.**
Q. Okay. In Exhibit 2, section XIA, where you give your opinion, you do not criticize Dr. Ford for his choice of Mellaril, simply for his failure to conduct an EKG and get serum potassium levels. Is that a correct reading of your report?
**A. Say that again.**
Q. Sure. In your report you do not criticize Dr. Ford for his choice to use Mellaril on Rachel

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

74

Jackson but only you're critical of the fact that he did not get an EKG or serum electrolyte levels. Is that a correct reading of your report?

**A. That's pretty much what my report says. Uh-huh.**

Q. Okay. And is that the way you feel today? Do you wish to expound on that or change your opinions in that regard?

**A. It's a -- it is not exactly a change. And I debated about this when I first read that. I'm not sure it falls below the standard of care to prescribe Mellaril. That's why I don't comment at all on it there.**

**I think a better choice might have been to maximize one of the other two, which may be a little less likely to cause arrhythmias and other problems; and neither one of those two was maximized in terms of dosage.**

Q. Okay.

**A. So rather than add a third antipsychotic with yet more side effects, I think I would have preferred to see one of the other two maximized. But I'm not sure that falls below the standards of care, and so I just left that out.**

Q. Okay. And so --

75

**A. But your question was, was I critical? Yes, but not below the standard of care.**

Q. Okay. So -- So perhaps to summarize, you might have done it differently; but you don't believe he breached the standard of care in prescribing Mellaril for this patient.

**A. I think, yes, I probably would have done it differently; and I think most people trained today would likely do it differently who have been taught to maximize the dose of one or two at most antipsychotics. But I agree I don't -- I can't say that it fell below the standard of care. So I'm not going to say that.**

Q. And did you read Dr. Ford's deposition testimony where he indicated his intent was over the next few days to actually wean the patient off of one or both of the other medications --

**A. Uh-huh.**

Q. -- she was taking?

**A. Yes.**

Q. And in your opinion, is that a reasonable thing to do; or would that have been a reasonable course of action?

**A. It would be reasonable to wean one of the other antipsychotic medications. It would have been reasonable to start at the same time you're adding a**

76

**third antipsychotic medication to the patient's regimen.**

**You now have the side effects and potential toxic effects of three different medicines.**

Q. But you agree that it's not a good idea typically to simply stop cold turkey, in this case specifically, either the Abilify or Risperdal but, in fact, to start the third medication and then slowly wean the patient off one of those two?

MR. LYONS: Objection, states fact not in evidence.

**A. If -- If you think one of -- If you think those aren't working and you're planning to stop one of them, you don't really have to wean them particularly. They can be stopped.**

Q. (By Mr. Starr) Okay.

**A. So, as I say, I can't say that that falls below the standard of care. It's -- but then you asked me the question am I critical. The answer is I'm critical, but I don't think it fell below the standard of care.**

Q. Okay. Dr. Ford prescribed this patient 100 milligrams of Mellaril on July 18th, 2008 to be taken one time at night. Is that your understanding?

**A. Yes.**

Q. And it is my understanding from reviewing the

77

medical literature that kind of the typical starting dose can be as much as 100 milligrams three times a day. Is that your understanding?

**A. Yes, if it's being prescribed for psychosis.**

Q. And so based upon -- which would be a total of 300 milligrams; right?

**A. Right.**

Q. And so based upon that, would you agree that Dr. Ford's prescription for Mellaril for this patient on July 19th was a fairly low prescript -- dosage compared to what, I guess, was allowed by the dosage parameters?

**A. If Mellaril were the only drug being prescribed, that would be true.**

Q. Okay. And based upon the other drugs that were being prescribed, would you still say that 100 milligrams of Mellaril prescribed by Dr. Ford on July 18th was a relatively low dosage of Mellaril?

**A. If you are looking at dosage ranges for Mellaril, yes.**

Q. Okay.

**A. There is the consideration that you have a patient on other antipsychotics that is not addressed by Mellaril dosage recommendations.**

MR. STARR: I'll object to the non-responsive portion.

Wright Watson and Associates, L.L.C.
512-474-4363
20 (Pages 74 to 77)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

90

Q. Okay.
**A. I kind of got caught up in those two, but that's it.**
Q. Okay. And in your earlier testimony, you talked a little bit about some things that could cause arrhythmias in some patients. Can the use of cannabis cause a heart arrhythmia?
**A. There's -- There are some reports of that. There are -- The answer is there are some reports of that. I haven't actually seen patients that are doc -- have been documented to have cardiac arrhythmias because of it.**
Q. But you said there have been some reports of the use of can -- cannabis causing arrhythmias and some fatal; is that correct?
**A. I believe I remember that some could be fatal. As, again, I haven't seen that, so...**
Q. And did you see what Ms. Jackson's cannabis toxicology levels were after her death?
**A. Yes. I don't remember what they were; but I saw them, yes.**
Q. Do you think that they were something that would be considered high cannabis levels post-mortem?
**A. I think Dr. Dolinak testified to that. I'm not sure what post-mortem ones are, how quickly it**

91

**declines --**
Q. Okay.
**A. -- if it does or if it's degraded post-mortem.**
Q. Okay. And low potassium can also cause fatal arrhythmias?
**A. Yes.**
Q. And I think Mr. Starr talked to you a little bit about this; but the type of cyst that Rachel had, the arachnoid cyst, could that possibly cause a fatal arrhythmia?
MR. LYONS: Objection, foundation.
**A. I think that's unlikely.**
Q. (By Ms. Casas) Okay. Do you know anything about brain cysts like the ones that Rachel Jackson had?
MR. LYONS: Objection, vague.
**A. I know some. I mean, I'm not a neurosurgeon; but --**
Q. (By Ms. Casas) Okay.
**A. -- I've had patients who've had cysts.**
Q. You've treated patients who have had cysts?
**A. Uh-huh. Sure.**
Q. And can a cyst in your brain affect the pressure of the cerebrospinal fluid in your brain?
**A. It can. It depends on where it is.**
Q. And can that cause somebody to stop breathing?

92

**A. More acutely, yes.**
Q. What do you mean by "more acutely"?
**A. Well, you know, she's -- If you have an increase in cerebrospinal pressure sufficiently from, say, a herniation of the brain, what you do is to wedge the breathing center, in essence, of the brain down into a smaller opening; and you can cause death that way.**
**The increase in cerebrospinal fluid causes something -- not usually stopping breathing but might cause, for example, incontinence, trouble walking, trouble thinking, things like that, depending upon where the pressure manifests.**
Q. Okay. And are you aware that Rachel Jackson urinated on herself at the time that she was arrested?
**A. Yes.**
Q. And can just the use of Mellaril alone cause a fatal heart arrhythmia?
**A. It certainly is known to cause arrhythmias which can be fatal.**
Q. And the use of Risperdal alone?
**A. Yes, it certainly can cause arrhythmias, as well.**
Q. I'm going to kind of back up a little bit; but going to the exhibit that is your list of cases -- that's Exhibit 4, I believe.

93

**A. Okay.**
Q. In any of these cases, did you have to participate in any hearings where your testimony was attempting to be limited in scope?
**A. What do you mean?**
Q. Have you ever been told by a court in one of these cases that your -- you shouldn't testify about certain things but only, you know, a particular set of items? For instance, causation.
**A. Usually when I participated, it's been -- I mean, I've offered opinions on what I was asked to offer opinions on.**
Q. Uh-huh. Yes.
**A. So what's your question?**
Q. You have never had -- participated in any kind of a hearing on a motion to strike a part of your testimony?
**A. I've been asked in court sometimes by the judge. I've been asked questions, more commonly in federal court, about my testimony and what it entails. Is that what you're asking me?**
Q. Yes.
**A. Okay.**
Q. And has a judge ever instructed you to limit your testimony to a certain area?

Wright Watson and Associates, L.L.C.
512-474-4363
24 (Pages 90 to 93)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D.
July 22, 2011

98

100

99

101

Q. Okay. Have you ever offered an expert opinion as to the constitutional adequacy of medical care in a correctional facility?

**A. No.**

Wright Watson and Associates, L.L.C.
512-474-4363

26 (Pages 98 to 101)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

114

Q. Okay. Okay. So in the practice of medicine, you can have symptoms that the patient may think is one thing; but it ends up being another thing?
**A. Sure.**
Q. For instance --
**A. Sure.**
Q. -- racing heart could be caused by anxiety?
**A. Sure.**
Q. If you're claustrophobic in small spaces, could that cause you to have a racing heart?

115

**A. Sure.**
Q. Okay. And would that be pseudio -- pseudocardiac?
**A. That was a bad choice of words on my part.**
**A racing heart can be a symptom of panic attack. It can be a symptom of orthostatic hypotension, the heart trying to compensate. It can be a symptom of a -- symptomatic of an arrhythmia. In fact, that plus shortness of breath are frequent presenting things for -- symptoms for an arrhythmia.**
**It could also be a direct medication effect, speed up the heart, or the drug of abuse. I mean, there are a lot of things that can cause the symptom of racing heart.**
Q. When you worked in the Harris County Jail on competency issues, what year was that?
**A. From about -- I'm having trouble remembering -- but about 1978, I would say, maybe '09, to the mid-Eighties, about '85, I'm going to say.**
Q. And Mellaril was around back then?
**A. Sure.**
Q. And when you worked at the Harris County Jail -- or with the Harris County Jail on competency -- competency issues, did you ever prescribe medication to the inmates you were looking at for competency?

116

**A. No. I did evaluations. There were other physicians there that treated them.**
Q. Did those physicians ever use Mellaril on the inmates?
**A. It sure seems so. It was on their medication list. So, yes.**
Q. Okay. And you right now -- I forget how you worded this. What is the position that you hold right now at -- at the hospital? Is -- Methodist Hospital.
**A. At Methodist, uh-huh. I have two positions. I'm the medical director of the inpatient psychiatry unit, and I'm the elected deputy chief of psychiatry.**
Q. Okay. Elected by whom?
**A. By the psychiatry service.**
Q. What is that?
**A. By the -- all the physicians in psychiatry have elected me the deputy chief.**
Q. At the hospital?
**A. At the hospital. Yes.**
Q. Okay. And in -- at -- it's called Methodist Hospital?
**A. Yes.**
Q. At that hospital are there any restrictions regarding which medications doctors are allowed to prescribe?

117

**A. You can prescribe those that are on the formulary. If they're not, then they have to be brought in; but I don't think there are any -- Well, there -- I guess there are a few that are restricted by the DEA; but other than that, no.**
Q. Okay. So you mentioned a formulary. What would you -- Are you familiar with the term "open formulary"?
**A. Vaguely.**
Q. What would -- What does that mean? Do you know?
**A. To me it -- it means that other -- that medications can be obtained that are not on the restricted formulary.**
**For the hospital, you mean?**
Q. Just in general.
**A. The -- Where I have heard it used most is in regard to insurance companies in which there are restricted formularies or like the Mental Health Mental Retardation Authority, they have a restricted formulary in which they are required to try certain drugs that are less expensive first.**
Q. Okay.
**A. And then if those don't work, you can apply for permission to give a more expensive drug.**

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

118

Q. Do you-all have a formulary at the Methodist Hospital?
**A. We do.**
Q. And are there drugs that aren't on the formulary that doctors are not allowed to use?
**A. It's not that they're not allowed to use them. It's that the hospital doesn't stock them.**
Q. Okay. So does the hospital stock Mellaril?
**A. I haven't even looked recently because no one's prescribed it since I did about a year ago.**
Q. Okay.
**A. So I haven't looked. There was a recommendation for removing it, and I think at that time the discussion was let's leave it a little while longer. I don't know since then. I'm not on pharmacy and therapeutics.**
Q. Okay. So there is nothing, as far as you know, that would prevent a doctor at Methodist Hospital from prescribing Mellaril to a patient?
**A. No, I don't think so. I think you could probably even bring it in from outside if it were brought in from an outside pharmacy, investigated by the pharmacy department and relabeled.**
Q. Are there any requirements on the doctors at the Methodist Hospital to perform ECGs before giving

119

Mellaril?
MR. LYONS: Objection, foundation.
Q. (By Ms. Casas) And I'm asking by the hospital, not by the FDA.
**A. No. I don't think the hospital would tell you what you have to do to prescribe a medication. I mean, I would -- of course, have taught the residents to do that; but --**
Q. So, basically, they could prescribe Mellaril and then use their education, training and experience to determine what would be necessary to do before giving the Mellaril?
**A. "They," talking about the residents?**
Q. (Nods head affirmatively.)
**A. They could. They'll see me next year, as well, doing the rotation over.**
Q. Right. And for doctors at the hospital, also?
**A. Yes. There's no -- In the vast majority of events that take place in the hospital, there is not going to be someone saying you must do it this way. That's what the doctor is for, is to assess the patient and to know what risks there are and to attend to those.**
Q. And what about potassium levels? So there's no instructions to doctors at Methodist Hospital about -- by the hospital about not using Mellaril until

120

you've checked potassium levels?
**A. No. As I said, there -- there are going to be very few things in a hospital, which is not in the practice of medicine, is going to tell a doctor that they must or must not do.**
Q. And that would be similar to a jail; correct?
**A. To a jail telling a doctor what to prescribe?**
Q. Right. That wouldn't make any sense; would it?
**A. It wouldn't to me. As I said, I've never prescribed anything in a jail; but I can't imagine that a jail would tell me how to practice medicine.**
Q. Right. Okay. Do you know if you've had any deaths at Methodist Hospital that were attributed to the use of Mellaril or Risperdal?
**A. I don't -- The man that died as a result of Mellaril overdose some years ago, I believe, was at Methodist. I can't remember if he was at Methodist or St. Luke's, but that was thought to be due to a Mellaril overdose. And he died with a cardiac arrhythmia they couldn't correct.**
Q. And an overdose is different than what happened or allegedly happened to Rachel Jackson in this case; correct?
**A. Right.**

121

Q. And what's the difference?
**A. Is that he took more than was prescribed.**
Q. And what was the problem with Rachel Jackson as opposed to that other one?
**A. She --**
MR. STARR: Objection, vague and ambiguous.
**A. Yeah. She -- As far as we know, she didn't take an overdose of Mellaril.**

Wright Watson and Associates, L.L.C.
512-474-4363
31 (Pages 118 to 121)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D.
July 22, 2011

122

Q. (By Ms. Casas) Is it unique to each individual? I mean, could the same dosage and combination of medications be safe in one individual but not safe in another?
MR. LYONS: Objection, compound.
**A. I don't know about safe. It might not cause problems --**
Q. (By Ms. Casas) Okay.
**A. -- in some people. Sure.**
Q. Okay. You testified that you worked with the Harris County Jail on competency issues. Do you have any specific experience in providing medical care in a correctional setting --
**A. No.**
Q. -- to inmates?
**A. I'm sorry. No.**
Q. Do you have any specific experience in providing psychiatric care in a correctional setting to inmates?
**A. I consider that a subset of medical care, yes.**
Q. Okay. So the same answer then?
**A. Same answer.**
Q. Okay. And, again, I can assume you have not published any articles on the provision of medical care in a correctional setting?

123

**A. That's true. As I say, I publish as little as possible.**
Q. Okay. And let's talk about nursing. Well, have you ever been a nurse?
**A. No.**
Q. Have you ever gone through training that nurses go through?
**A. I've never been to nursing school.**
Q. Okay.
**A. Some of their training is coincident with ours in some areas.**
Q. Okay. Have you -- Do you have any specific experience with providing nursing care in a correctional setting?
**A. No.**
Q. Do you know what is constitutionally required regarding medical care in a correctional setting?
**A. Constitutionally required? No.**
Q. And you agree that a jail is not a hospital; correct?
**A. Yes.**
Q. Have you ever provided any kind of consulting services regarding medical care or psychiatric care in a correctional -- correctional setting?
**A. Yes. I'm trying to think of the specifics of**

124

**that. I believe I was one of several people back in, I'm going to say, maybe the early Eighties when there were some lawsuits about the Texas Department of Corrections. It was, I don't know, like a consortium of people that -- of psychiatrists that were discussing psychiatric care within -- in the prison system.**
**It wasn't testimony. It was a group of us that were sort of asked for opinions about the level of care that should be there, what facilities should be available; and it had something to do with meeting federal standards or a federal judge's standards or something like that.**
Q. Okay. And -- Was that the Ruiz case?
**A. It could have been. I don't know.**
Q. That dealt with prisons, not jails; correct?
**A. Right. This was a federal judge overseeing this, so I'm thinking it was probably a prison system.**
Q. And do you know whether there is a difference in a prison or a jail?
**A. Yeah. There is -- I know there is a difference, but I thought you asked me in correctional facilities.**
Q. Yes, I have been. Now I'm asking a different question.
**A. Okay.**

125

Q. You're saying -- in the case where you consulted --
**A. Yes.**
Q. -- that was about a prison; correct?
**A. I'm pretty sure it was.**
Q. Okay.
**A. Because it was people that were there for a while, for a long time.**
Q. Okay. So those would be people who have been convicted of crimes and are serving their sentence.
**A. I think so. Again, it's very vague to me since there were a group of us that were asked to just comment on that, so...**
Q. Okay. Again, like Mr. Starr, I hate to ask you; but have you ever been sued for malpractice?
**A. Yes. I was sued once.**
Q. How long ago was that?
**A. That was probably in the -- I'd say the early to mid-Nineties.**
Q. Okay. And where was that lawsuit filed?
**A. Harris County.**
Q. Here in Harris County?
**A. Uh-huh. Yeah.**
Q. And what malpractice were you alleged to have committed?

Wright Watson and Associates, L.L.C.
512-474-4363
32 (Pages 122 to 125)
EXHIBIT F
5ce5c018-78c5-4b44-aebd-7206818c20a1



130

Q. Okay. Were you asked to -- by Mr. Lyons -- to provide an opinion as to what the nurses did?
**A. I don't remember if I was asked specifically. I'm assuming I was.**
Q. Okay. So that wasn't just something you just spontaneously decided to do?
**A. I actually don't remember; but if I were asked about the issues that came about in terms of her care, I might have addressed that.**
Q. Okay. The issue here -- you say in subsection B "if the nurse was aware of Ms. Jackson's chest pain..." What nurse are you referring to there in that sentence?
**A. The nurse that was taking care of her, the nurse that was in charge.**
Q. Okay. So are you assuming that there was one nurse assigned to Rachel Jackson?
**A. I could refer to just nursing staff, because nurses change. They don't live there 24 hours. And they may rotate the patients they're taking care of, as well.**
Q. Okay. But --
**A. I'm not saying any one nurse. I'm saying a nurse.**
Q. Okay. What would make you think that a nurse

131

was aware of Ms. Jackson's chest pain?
**A. I just said if she were.**
Q. Okay.
**A. That is, if someone told her or Ms. Jackson told her. If Ms. Jackson had chest pain, told no one and died from it, of course, the nurse isn't responsible.**
Q. Okay. And do you mean professionally responsible or legally responsible?
MR. LYONS: Objection, calls for a legal conclusion.
**A. I'm not a lawyer. I just know what nurses are supposed to do in terms of taking care of patients.**
Q. (By Ms. Casas) Based on your review of the information in this case, which nurses were aware or may have been aware of Ms. Jackson's chest pain?
**A. What I was saying was if a nurse became aware of that. I don't know that any nurse did become aware of that because I don't know who was told, who wasn't told, who heard, who didn't hear. I know that some -- a nurse came to take blood pressure, but I don't know what that nurse knew.**
Q. Okay. And by that you mean whether -- whether the nurse knew that her heart rate was normal, for instance?

132

**A. She could probably figure that out from the blood pressure, the vital signs that she checked.**
Q. Okay.
**A. But I -- I don't know -- it -- it says the nurse is here checking vital signs.**

133

Q. Okay. And what you're talking about, the reporting it to the physician, is that something that a nurse would learn as part of his or her professional education and training?
**A. Yes. It's what my nurses learn as part of their training.**

EXHIBIT F
5ce5c018-78c5-4b44-aebd-7206818c20a1



standard of care was the failure to provide information about the chest pain; is that correct?

**A. To the patient?**

Q. To the doctor.

**A. If she was aware -- I'm saying she --**

Q. Uh-huh.

**A. -- because most nurses are women. It's not intended to be sexist.**

**If she was aware of her chest -- Ms. Jackson's chest pain and knows that there's a risk to Ms. Jackson -- whether it's because of her cocaine use or any medications, whatever -- and does nothing about that, then, yes, I think that does fall below the standard of care for nurses.**

Q. So in that situation what the nurse would have done wrong is not relay information to the doctor?

**A. Or not did do something. Not do something. I**

Q. (By Ms. Casas) Okay. Dr. Ray, I'm going to refer back to your opinions in section VI (sic) of your report, in particular paragraph B that deals with the nurse.

Have you ever provided expert testimony regarding the standard of care for a nurse?

**A. I don't think that was the primary question that's been asked in any case, but it's come up probably on several occasions.**

Q. Okay. And in what way?

**A. Usually something similar on what the nurse's job was in relating to a physician about a patient.**

Q. And did you -- were you allowed to testify to that in court?

**A. I don't remember if it was in court. Actually, one of them, I think, was in court.**

Q. And where was that?

**A. It would have been here in Harris County, and I think the case was a patient in a psychiatric hospital; and the question of what the nurse's duty was -- I can't remember what it was -- what the incident was; but it was about the nurse's duty in terms of reporting or safeguarding the patient.**

Q. And how long ago was that?

**A. Oh, it's probably been some years.**

Q. Approximately how many years?

**A. Somewhere between five and ten, best guess.**

Q. Okay.

**A. I don't know.**

Q. Do you think it's closer to five or closer to ten?

**A. I really don't know.**

Q. Okay.

**A. But it comes up as sort of an ancillary question in some malpractice cases and some hospital-related cases.**

Q. What you're saying in paragraph B about the nurse -- or a nurse or the nursing staff, other than what you put in paragraph B, is there any other thing

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

138

that you believe fell below the standard of care for the -- you know, by the nursing staff at the jail?

**A. I guess it would -- The answer is it would depend, and what it would depend on is whether the documentation of vital signs is something to which Dr. Ford or another physician would have had access.**

Q. Okay. And what do you mean by that?

**A. And I answered that because it's -- it'll take me a second to explain.**

**If that is simply a record that's kept somewhere and the physicians don't have access to it and the next shift of nurses doesn't have access to it, then it's really not below the standard of care not to document it because it's not going to make any difference at all.**

Q. Okay.

**A. If it is something that -- because we don't know if they're -- what they were.**

Q. Okay.

**A. It says normal, but we don't know.**

**If it is something that Dr. Ford might have been able to look at the next day and go, "Pretty normal, but look at that tachycardia. That's quite a bit different from what it was before." Or the next shift of nurses might have said, "That -- That blood**

139

**pressure is really off. I'm going to go check it again." Then the lack of documentation may fall below the standard of care in taking care of the patient. I can't say with certainty that it was because I don't know about the access to the records.**

Q. Okay.

**A. That's why I didn't say anything.**

Q. Do you intend to offer an opinion as to that?

**A. I guess if someone provides me more information about the access to the records and what the vital signs were, I could; but I haven't been asked to.**

Q. And you have not put that in your report; correct?

**A. Right. Uh-huh.**

Q. And what you're concerned with primarily is the sharing of information and documentation; correct?

MR. LYONS: Objection, vague.

**A. About that? Yes.**

Q. (By Ms. Casas) About the nurses.

**A. About that incident, yes. That's what I'm concerned about.**

Q. Okay. Anything other than issues dealing with documentation or sharing information with the physician that you believe the nurses did wrong?

**A. I'm not aware of anything else, no.**

140

Q. Do you have any reason to believe or conclude that a nurse intentionally disregarded a substantial risk of serious harm to Ms. Jackson?

**A. I don't know, first of all, if they knew of it. I don't know if they knew of the chest pain. So I can't answer that.**

**What I said was if they knew and if they were aware -- which I think many nurses working in that kind of facility, certainly in a psychiatric facility, would be aware of the risk of cardiac problems, if nothing else, with cocaine and with the medications in general -- then I think it would be problematic.**

**If they didn't know, then they didn't know.**

Q. Okay. But nothing that neither nurses actually did -- Do you have an opinion as to whether the nurses at Travis County Jail actually did anything to Ms. Jackson that you would consider below the standard of care?

**A. That they did to her?**

Q. Uh-huh. Yes.

**A. Do you mean sort of an act of commission? No.**

Q. Okay. Yes, as opposed to omission.

**A. Uh-huh. Yes.**

Q. Okay. Do you -- Are -- Do you intend to

141

offer any opinions on whether the actions of Travis County's correctional staff relating to Rachel Jackson was -- at all, do you intend to offer opinions as to their actions?

**A. No. I don't know the standard of their requirements.**

Q. Okay. Are you familiar with the type of training that's required for correctional officers?

**A. Only vaguely.**

Q. Okay. Do you know what's constitutionally required for training of correctional officers?

**A. No.**

Q. Do you have a contract with Mr. Lyons for expert services in this case?

**A. A contract? Do you mean something signed?**

Q. Yes.

**A. No.**

Q. A written contract?

**A. No.**

Q. Everything was done orally?

**A. Yes.**

Q. Okay.

**A. Except for the check he wrote.**

Q. Okay. And the fee that you're charging Mr. Lyons is your customary fee for expert testimony?

EXHIBIT F

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

142

[redacted]

Q. Okay. Are you intending to offer any opinions as to policies, practices or customs of the Travis County Sheriff's Office?

**A. No.**

Q. Was there -- In your opinion, was there a

143

failure to provide Rachel Jackson with a licensed psychiatrist?

**A. I beg your pardon?**

Q. At the jail, was there a problem -- In your opinion, was she denied access to licensed medical professionals?

**A. I think Dr. Ford saw her.**

Q. Okay. And he's a licensed medical professional?

**A. Yeah. He's a psychiatrist.**

Q. Okay. And so it's your understanding of the facts of this case that Rachel Jackson did have access to medical professionals while she was in the jail?

**A. Yes. I think Dr. Ford's notes are in there, and he's testified he saw her.**

Q. And do you know whether Dr. Ford had had any prior issues with the Texas Medical Board?

**A. I don't know that.**

Q. Did you try to look and see or check?

**A. No.**

Q. Have you reviewed any training or educational or licensing records of any of the defendants or defendants' employees in this case?

**A. No.**

Q. And when you -- Since everything was done

144

with Mr. Lyons orally, as far as engaging you, what specifically was it that he asked you to do?

**A. He asked me to review records and give an opinion about the standard of care in terms of caring for Ms. Jackson.**

Q. Okay. And do you know whether there's any difference in dealing with failure to meet the standard of care for a governmental employee versus a non-governmental employee, legally?

**A. I'm not a lawyer, so I don't know.** [redacted]

Q. Okay. So what I'm saying basically is you -- Well, your opinions about failing to meet the standard of care, you're not necessarily saying that that would make a governmental employee liable for anything?

**A. I have no idea what the liabil --**

MR. LYONS: Objection, calls for a legal conclusion.

**A. I'm sorry. I was going to say I have no idea what the legal liability is.**

Q. (By Ms. Casas) Are you familiar with the Texas Tort Claims Act?

145

**A. Texas joint claims act?**

Q. Tort Claims Act.

**A. No.**

[redacted]

Wright Watson and Associates, L.L.C.
512-474-4363

37 (Pages 142 to 145)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1



146

147

148

Q. So I'm going to back up a little bit, back to the nurse.

You understand there is not a nurse that's a defendant in this case?

**A. Okay.**

MR. LYONS: Objection. Objection. It calls for a legal conclusion.

Q. (By Ms. Casas) Do you understand that Travis County is a defendant in this case?

**A. Okay.**

Q. Do you understand that or --

149

**A. Yes.**

Q. -- is that your -- Was that your understanding -- Have you reviewed the complaint at all in this case?

**A. Yes.**

Q. Okay. And that was as -- before you did your report?

**A. I think so. I think it's listed, the way the case is styled anyway; isn't it?**

Q. Yes. You -- In your opinions you don't say anything in your expert report regarding Travis County; correct?

**A. Right.**

MR. LYONS: Objection, vague.

Q. (By Ms. Casas) And on section VI (sic) of your expert report, you have sections A, B, and C. You don't have any opinions there about Travis County; do you?

MR. STARR: XI.

Q. (By Ms. Casas) I'm sorry. XI. About Travis County; do you?

**A. I knew what you meant. I was just -- just going with it.**

**Right. It doesn't mention Travis County.**

Q. Okay. Are you trying to opine that Travis

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

150

County is somehow responsible for Dr. Ford's behavior?
**A. I don't know what Dr. Ford's relationship with Travis County is or isn't.**
Q. Okay.
**A. So I have -- I could comment about physicians. I can comment about nurses reporting to physicians and taking care of patients. I don't know anything about counties.**
Q. Okay. So paragraph B specifically refers to the nurse or nurses. I'm trying to understand, do you have some kind of a theory that Travis County would be responsible for the nurses' actions solely because they employed them?
**A. I --**
MR. LYONS: Objection, vague, argumentative, calls for a legal conclusion.
**A. I have no idea what their relationship with the nurses is. I don't know if the nurses are employed there, if they happened to show up and volunteer. I don't have any idea. I'm commenting on nurses' clinical behavior and a physician's clinical behavior, not relationships with their employers.**
Q. (By Ms. Casas) Okay. Questions...
You said earlier you had treated patients that had brain cysts; is that correct?

151

**A. Sure.**
Q. And did you already know they had a brain cyst when you started treating them?
**A. There are not a huge number. At least a couple of them, yes. One I was called by neurosurgery because we knew he had a cyst. Another one we got an MRI just because it was a first episode psychosis and saw a cyst, and I called to neurosurgery to evaluate. They said: Leave it alone. Don't do anything.**
Q. And do you have any experience in neurology?
**A. There is limited training in neurology when we're in psychiatry residency and then in my year in internal medicine, but I'm not a neurologist.**
Q. The cyst -- Would a cyst in the brain that prevented parts of the brain from forming, such as the amygdala, would that be considered a primary central nervous system pathology?
**A. It's a -- It is a primary pathology likely, and it is in the central nervous system. That encompasses a whole wide variety of things, but it -- it would fall into that umbrella, I suppose.**
Q. Do you have any experience in neurosurgery?
**A. No.**
Q. Okay. Are you -- Do you have experience in dealing with intracranial hypertension?

152

**A. Enough to call someone if that happens.**
Q. Okay.
**A. Yes. The answer is no. I don't deal with that in psychiatry.**
Q. Okay. How would you know if it's happening?
**A. Usually if -- through a consultation or through symptoms causing me to refer someone to a neurologist.**
Q. And what kind of symptoms would suggest intracranial hypertension?
**A. Almost any neurological symptoms; and some of those might be gait disturbance, cognitive disturbances, incontinence.**
Q. Okay. Can a seizure -- Can someone die from a seizure?
**A. Yes.**
Q. Can a seizure cause a fatal arrhythmia?
**A. I'm assuming that that's ultimately how one dies is -- the heart ultimately has to go into arrhythmia to quit working. Whether that causes it directly, I think it can sometimes be an asphyxiation type death.**
Q. Do you know if Rachel Jackson had a history of seizure?
**A. She apparently did in childhood have a**

153

**seizure, I think.**
Q. And is that something that's common with intracranial cysts or brain cysts?
**A. I don't know the incidence of that.**
Q. So you're not planning on giving any opinions as to whether or not Travis County Jail's policy for the provision of medical care were constitutional or not constitutional; are you?
**A. No.**

Wright Watson and Associates, L.L.C.
512-474-4363

39 (Pages 150 to 153)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

158

160

159

Q. Okay. Is it fair to say that you have not handled cases involving similar problems as Rachel Jackson, the QTc interval and the use of street drugs and being in jail?

MR. LYONS: Objection, vague.

**A. The patients I treat are not in jail. They -- I have a fairly high incidence of street drugs and other medical problems.**

161

Wright Watson and Associates, L.L.C.
512-474-4363

41 (Pages 158 to 161)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1



170

172

Q. We talked about your opinions in paragraph B of section XI of your report, and there's nothing in there about the pharmacist. Do you intend to offer any opinions as to the pharmacist at the jail?

**A. No.**

Q. Do you -- Have you ever offered opinions on actions of pharmacists?

**A. Not that I recall, no.**

171

173

Q. Okay. Do you -- You're not offering an opinion as to causation; correct?

**A. I'm sorry?**

Q. Causation of her death?

**A. And what was your question about it?**

Q. You're not offering an opinion as to the causation of Rachel Jackson's death?

**A. No.**

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1



174

176

Q. (By Ms. Casas) Okay. And you -- your opinions in your report all talk about the standards of

175

177

care, and you're -- you're offering opinions as to the standards of care; but it's not your opinion that these breaches of the standards of care are what caused Rachel Jackson's death; are you?

MR. LYONS: Objection, foundation. Objection, asked and answered.

MR. STARR: Same objection.

**A. The answer is since I'm not commenting on the cause of her death --**

Q. (By Ms. Casas) Okay.

**A. -- then I am really not talking about causation.**

MS. CASAS: I pass the witness.

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1



182

[redacted]

183

FURTHER EXAMINATION

BY MR. STARR:

Q. You had testified before -- and we went over it kind of in great detail -- that you did not believe Dr. Ford had breached the standard of care in prescribing Mellaril to Rachel Jackson, although you might have done things differently; correct? Do you remember that line of testimony?

**A. Right.**

Q. So, similarly, I assume you do not believe the prescription of Mellaril to Rachel Jackson on July 18th was contraindicated in any way; is that correct?

MR. LYONS: Objection, form.

**A. The event of prescribing, no.**

Q. (By Mr. Starr) Okay.

MR. STARR: What's the basis of your objection?

MR. LYONS: Well, it doesn't include the relevant facts to -- It was -- It's ambiguous and doesn't include that she -- that he was prescribing it despite the fact that he had not done an EKG and a serum potassium.

Q. (By Mr. Starr) I want you to assume that in these facts that we have before us --

184

**A. All right.**

Q. -- other than Dr. Ford's failure to perform an EKG and take electrolyte levels, can you find in any other way that his prescription for Mellaril was contraindicated for Rachel Jackson on July 18, 2008?

**A. Contraindicated, no.**

Q. Okay.

**A. Not -- not at that strength.**

Q. All right. In scientific literature, can you tell me what the difference is between an association and a causation or a causal effect?

**A. Uh-huh. I can.**

Q. Okay.

**A. Go for it?**

Q. Have at it.

**A. Okay.**

Q. Yes.

**A. A causal effect is something that's essentially proven to cause something. So a one-on-one relationship. If I do A, then B will result.**

**An association means that it is found in conjunction with, either temporally or -- usually temporally or in a -- in association with the other event.**

Q. Okay.

185

**A. An example, if -- unless you want to think it's non-responsive, I'll --**

Q. Well, let -- let me just ask you some questions.

**A. Okay.**

Q. It's my understanding when the FDA is approving various medications, in the association category they list anything and everything that was suffered by a patient, whether or not it was related or caused by taking a certain medication; correct?

**A. (Nods head affirmatively.) My understanding is they list associations, yes.**

Q. And -- And so truthfully, with -- while the FDA -- and this is an absurd example, but I want to give it to you anyway.

If someone within taking Mellaril in the pre-trial portion fell and broke his leg, there's a decent chance the FDA would list broken leg as part of an association with Mellaril.

**A. Maybe. They would probably list syncope more than likely, but go ahead.**

Q. But -- But that's the type of thing. Whether or not the broken leg had anything to do with that, it's simply associated because he was taking Mellaril and broke his leg at the same time; correct?

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

186

**A. Yeah, it might be.**
Q. And the Mellaril doesn't necessarily cause the broken leg, and that's why they list it under associated; correct?
**A. Yeah.**
Q. Have you seen, either in this litigation or otherwise, the Novartis product literature for Mellaril? And this is after the black box warning was introduced.
**A. Although I don't remember it looking like this I mean, I've seen it from pharmacists and like --**
Q. And I have a -- I have a PDR version, as well, that --
**A. Same thing. Uh-huh.**
Q. -- looks similar if you want to see it.
**A. Yeah. This looks like a PDR, something from of it.**
Q. Okay.
**A. Yeah.**
MR. STARR: Let's mark that as Exhibit No. 10.
(Ray Exb. No. 10 was marked.)
Q. (By Mr. Starr) If you would turn to page 5 of the manufacturer's literature.
**A. Okay.**
Q. And I'm looking at the third paragraph down

187

which starts with the word "prolongation."
**A. Right.**
Q. And the last sentence in that paragraph, could you read that out loud?
**A. It says, "A causal relationship between these events and Mellaril therapy has not been established; but, given the ability of Mellaril to prolong the QTc interval, such a relationship is possible."**
Q. Okay. And I'm sorry. I should have had you read -- you can read the top of that paragraph, but I'll -- I'll relate to you that what it's talking about is sudden death.
**A. Uh-huh.**
Q. And so based upon your reading of this paragraph, is it your understanding that both the manufacturer and the FDA are saying that a causal relationship between arrhythmias and sudden death with Mellaril therapy has not been established? Is that your understanding of what's set forth there?
**A. I may be non-responsive, but the answer is partly.**
Q. Okay. And -- And let me ask it again --
**A. Uh-huh.**
Q. -- just so we kind of understand.
**A. Okay.**

188

Q. Based upon your review of that entire third paragraph starting with the word "prolongation" --
**A. Uh-huh.**
Q. -- is it your understanding that the manufacturer of Mellaril, in conjunction with FDA approval, is stating that a causal relationship between arrhythmias and sudden death and Mellaril therapy has not been established but is possible?
**A. There are two steps. One step has been established. The second one is only possibly established.**
Q. Right.
**A. The first step is established.**
Q. They're saying there is no causal relationship which has been established. Isn't that what the manufacturer's literature says?
**A. Between the events of presumably sudden -- sudden death.**
Q. Right.
**A. It doesn't -- or it could be a torsades de pointe in sudden -- yeah, in sudden death.**
Q. And so do you read this particular paragraph and sentence to indicate that the manufacturer and the FDA do not believe there is a causal relationship between taking Mellaril and fatal aris -- arrhythmias

189

and sudden death?
**A. I don't know that the FDA particularly joins in this part, this paragraph here. The FDA is the one that dictates the black box warning.**
Q. Does the F -- Would the FDA allow Novartis or the manufacturer of this material to print something that was not approved by the FDA?
**A. I don't know the answer to that entirely. I know they can require a black box warning, which is very clear. The rest of it, I don't know.**
Q. You don't know whether a manufacturer can just write anything it wants, and it has no oversight whatsoever in that product manufacturer literature by the FDA? Is that your testimony?
MR. LYONS: Objection, argumentative.
**A. I don't know the answer to that. I know -- I know they can require a black box warning with specific words in there. I've seen that.**
Q. (By Mr. Starr) So at least -- and we'll take the FDA out. At least for the product literature, you have the manufacturer of Mellaril saying there is no causal relationship between taking Mellaril and fatal arrhythmias and sudden death; is that correct?
**A. Uh-huh. Or at least -- It says it's not been established. So there's no known causal relationship.**

Wright Watson and Associates, L.L.C.
512-474-4363

48 (Pages 186 to 189)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

**I'll go with that.**
Q. Okay.
**A. Uh-huh.**
Q. Mr. Lyons asked you earlier whether or not -- We were talking about literature.
**A. Uh-huh.**
Q. He asked you whether you had reviewed the three studies cited in the "Dear Doctor" letter; and I think you said: Yeah, I did a long time ago.
**A. Back when it came out.**
Q. And --
**A. I'm sure I went and looked.**
Q. And I believe you said that they discussed arrhythmias caused by Mellaril?
**A. Yeah. That's my recollection. I haven't looked at them in years.**
Q. Okay. I -- I've got them here.
**A. Oh, good. Going to look at them again.**
Q. And you can take as much time as you want.
**A. Okay.**
MR. LYONS: Let's attach them as exhibits as we show them to the witness, please.
MR. STARR: We'll attach them as 11, 12 and 13.
MR. LYONS: Let's take a --

MR. STARR: Yeah. We can take --
MR. LYONS: Do you want to take a break while she looks over it?
MR. STARR: -- a long break.
THE VIDEOGRAPHER: Okay. We are off the record at 3:44 p.m. This concludes tape number 3.
(Off the record from 3:44 - 3:55 and Ray Exb. Nos. 11 - 13 were marked.)
THE VIDEOGRAPHER: We are on the record at 3:55 p.m. This is the beginning of tape 4.
Q. (By Mr. Starr) Dr. Ray, I want to go quickly over the three articles. And you have now had the time to review them --
**A. I have.**
Q. -- to the extent you want to.
Exhibit 11 is what I will refer to as article number one.
**A. Okay.**
Q. And it's my understanding that medical article consisted of a study size of nine healthy male subjects; is that correct?
**A. Right.**
Q. And in the scientific community, is that typical to -- to base peer-reviewed opinions upon a study size of only nine people?

**A. It depends. Sometimes it's reasonable. In some cases it wouldn't be.**
Q. What are the cases where it wouldn't be reasonable?
**A. If you were trying to study, you know, maybe an association effect that you weren't going to give them anything. If you were going to try to figure out, for example, if being over 6 feet tall tended to predispose you to cardiac arrhythmias, nine people probably wouldn't do that.**
Q. Is it your opinion in this case that a sample size of nine people in this article number one was sufficient to justify a peer-reviewed medical study?
**A. Probably so. They actually took these guys and gave them new drugs.**
Q. In number 1, the fact that these are healthy male subjects as compared to Rachel Jackson --
**A. Uh-huh.**
Q. -- in your mind, are there any distinguishments -- distinguishing characteristics to be made there --
**A. Sure.**
Q. -- that we would expect different results because these are nine healthy males instead of Rachel Jackson who is a not so healthy female?

MR. LYONS: Objection, states facts not in evidence.
**A. What you -- The reason that they picked nine healthy males is that there aren't other confounding factors; and back when some of these were done, typically you used male subjects because there wasn't also thought to be the confounding factor of hormones. So frequently men were used back then. And it was pretty typical to get some healthy usually youngish men so you wouldn't have other confounding factors that you might say: Oh, that's probably it.**
**So the things that you would expect to be different are that people who are sicker or who have other drugs in their system or who have other -- are older -- would have more confounding factors and less clear results and be more likely to have health effects.**
Q. Okay. And what were the findings of article number one?
**A. The findings of -- I'm sorry. What was the last part?**
Q. I'm sorry. Of article number one.
**A. Of article number one.**
Q. Exhibit 11.
**A. Basically, it says that Mellaril or thioridazine has dose-related effects on ventricular**

EXHIBIT F

**repolarization -- oh, sorry -- thioridazine has dose related effects on ventricular repolarization. The parent drug, meaning the thioridazine itself, causes an important portion of these effects, although metabolites also contribute.**

Q. And does it quantify -- to the extent it claims that Mellaril increases the prolonged QTc interval, does it quantify them in these nine people on average?

**A. Yeah. Let's see. The mean QTc was increased from 388 to 411.**

Q. Which would be --

**A. Let's see, that's -- Wait a minute. Hold on. I'm looking for the dosage of that one. That was -- That was the 50 milligram dose.**

Q. So in that study they found on average a approximately 5 percent increase, 5 to 6 percent increase in the QTc level?

**A. I need to do the math. It's from 388 to 411. So 12 -- 23.**

Q. And, again -- Okay. In your review of Exhibit 11, is it a true statement no one died, at least from what you can tell?

**A. Not that they reported, no one died.**

Q. No -- No one had sudden death or pointe de so or whatever the arrhythmias are?

**A. Torsades de pointe.**

Q. Torsades de pointe.

**A. Uh-huh. Yeah. Right.**

Q. And so we cannot look at Exhibit 11 and say the use of Mellaril causes fatal arrhythmia or sudden death. Is that a correct statement?

**A. You can't say that it caused -- that it has a -- a direct cause by this article. You can say that it prolongs the QTc interval which can be associated with death. We know that.**

MR. STARR: I'll object as non-responsive.

Q. (By Mr. Starr) My question was a little different.

**A. Okay.**

Q. Just in reviewing this article of the subjects, none of them died.

**A. Right.**

Q. None of them had fatal arrhythmias.

**A. They had arrhythmias. None of them fatal.**

Q. And so as a result of this article, we cannot say, nor could anyone say, that this proves Mellaril causes fatal arrhythmias or sudden death?

**A. We can't say from here that it causes sudden death. We can't say that it caused a fatal arrhythmia. We can say it caused an arrhythmia which can be fatal.**

Q. In some people.

**A. Right.**

Q. Okay. Exhibit No. 12.

**A. Okay.**

Q. And I will refer you to -- or I'll maybe just read from -- I don't know if it's in here.

The FDA letter indicates that this second study studied increased levels of thioridazine in patients with a genetic defect resulting in slow hydroxylation of debrisoquin.

**A. Uh-huh. That's good.**

Q. Does that have anything to do with Rachel Jackson?

**A. Not that we know of.**

Q. We don't know that she had a genetic defect --

**A. Right.**

Q. -- such as studied in this case; correct?

**A. Right.**

Q. And so can we glean anything from this case?

**A. No. This is just talking about other things that might contribute to thioridazine being more toxic.**

Q. And -- But it is not relevant to her case because she didn't have that genetic defect as far as you know.

**A. As far as we know, that's true.**

Q. Okay.

**A. Uh-huh.**

Q. And, finally, Exhibit --

**A. 13.**

Q. -- 13 --

**A. Uh-huh.**

Q. -- was a study which evaluated the effect of a drug called fluvoxamine --

**A. Uh-huh.**

Q. -- on thioridazine levels.

**A. Right.**

Q. And as far as we know, Rachel Jackson did not take fluvoxamine; correct?

**A. Right.**

Q. And so, once again, article number three relied upon in the FDA letter would be completely irrelevant to Rachel Jackson's case.

**A. Well, what I haven't looked at is -- because I think they at least measure plasma levels before giving the fluvoxamine.**

**Yeah. The focus of this article really is on fluvoxamine prolonging the higher blood levels.**

Q. Okay. Since she wasn't taking fluvoxamine, it

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

198

really doesn't help us too much; is that correct?
**A. That part doesn't. I was just looking to see if they measured QTc intervals on thioridazine as monotherapy.**
**Yeah, I don't see it. Just in perusing it right now, I don't see anything that's relevant to that. It may be in here, but I don't see it. But the focus of the study, you're right, is on fluvoxamine inhibiting the metabolism of thioridazine.**
Q. And out -- So out of the three studies cited in the FDA "Dear Doctor" letter, only Exhibit 11 -- which I will say article number one --
**A. Uh-huh.**
Q. -- had any relevance to this case; is that correct?
**A. Any direct relevance, yeah, as far as we know.**
Q. And -- and that Exhibit 11, article one, nobody died and we're not really able to correlate a -- what did we say -- a 20 percent increase in QTc prolongation with percent chance of death; is that correct?
**A. In this -- In this article, no, because no one died; but we know -- what we do know is that it can be a fatal arrhythmia, and that's why the concern.**
MR. STARR: I'll object to the

199

non-responsive portion.
Q. (By Mr. Starr) No one in article 11 -- or article one, Exhibit 11, had a fatal arrhythmia; correct?
**A. Okay.**
Q. And all we know is by that article, that in those nine patients, a fairly small sample, that there was a mean prolongation of approximately 20 percent -- well, maybe less than that -- 15 to 20 percent; is that correct?
**A. It's 23 millimeters out of about 400.**
Q. Okay.
**A. So whatever that is.**
Q. Have you seen any articles or seen any studies which discuss how large a prolongation is necessary in order to cause sudden death or fatal arrhythmias?
**A. No. But we know the longer it gets, the more likely death is. That's -- Or the more likely the arrhythmia is. Let me put it that way.**
Q. Okay. But we haven't seen any studies that say what number we need to reach where 95 percent of fatal arrhythmias happen.
**A. There may be statistics like that in cardiology. I don't know.**
Q. Okay. In his deposition Dr. Ford discussed

200

the difference in medical terminology between an absolute contraindication and a relative contraindication. Do you recall that testimony?
**A. Yeah.**
Q. And are you familiar with those two terms, separate and apart from Dr. Ford's testimony?
**A. Yes.**
Q. Can you tell me what a relative contraindication is?
**A. A relative contraindication means that it's something that usually should not be done. There may be ex -- extenuating or special circumstances that might permit it to be done.**
Q. What's an absolute contraindication?
**A. It should not be done.**
Q. Is it your opinion that providing Mellaril -- Well, let me show you.
Actually, do you have that Novartis literature?
**A. Yeah. There you go.**
Q. Yeah. If you will turn to page 5, fifth paragraph down that begins with: "It is recommended."
**A. Uh-huh.**
Q. Why don't you read through that quickly?
**A. Do you want me to read it out loud?**

201

Q. No, no.
**A. Oh.**
Q. Just let you read it.
**A. (Witness complies.) Okay.**
Q. Page 5, the fifth paragraph down indicates: "It is recommended that patients being considered for Mellaril treatment have a baseline ECG performed and serum potassium levels measured." Is that -- Did I read that properly?
**A. You did.**
Q. And do you believe that sentence to define the standard of care for what you believe Dr. Ford breached in this particular case?
**A. I don't think that sentence defines it. I think it reflects it.**
Q. Okay. Is it your opinion it is an absolute contraindication to prescribe Mellaril without performing a baseline ECG and taking serum potassium levels?
**A. No. As I said before, it's not absolute. It's a pretty strong relative contraindication.**
Q. Okay. And Dr. Ford similarly testified he believed this was a relative contraindication. Is that your recollection?
**A. Yeah, that he said so. Uh-huh.**

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

Regina Jackson, et al v. John S. Ford, M.D., et al
Priscilla Ray, M.D. July 22, 2011

202

Q. And would you agree that a relative contraindication, part of what goes into that is that a physician being aware of potential warnings needs to weigh the risks and benefits of prescribing certain medication for an individual patient?

**A. Of course.**

Q. And is that what you believe Dr. Ford did in this case?

**A. Do I believe he weighed them? I'm assuming he did.**

Q. And he testified he was aware that this warning was out there and, yet, in Rachel Jackson's particular case, he thought it was still in her best interest to give her Mellaril. Is that your understanding?

**A. What he seemed more to say was that he just thought those warnings were overly cautious. He didn't say specifically about her.**

Q. Do you believe -- and -- and I think you may have already answered this about absolute; but in this sentence in the manufacturer's recommendation where it says "It is recommended" that patients get an ECG and serum potassium level, you do not equate "It is recommended" with "doctors must."

**A. There is no "must" in there because there**

203

**might be some circumstance in which it would be appropriate not to do that, but I don't think that's the case here. That's --**

MR. STARR: And I'll object to the non-responsive portion.

**A. Okay.**

Q. (By Mr. Starr) Are there circumstances where either the FDA or medical pharmaceutical manufacturers use the word "must"? You must not do this or else the patient's going to die.

**A. There are a few. Most of those are regulated in some other way by the FDA.**

Q. Okay. And those would be our absolute contraindications.

**A. Yeah. The FDA just doesn't approve their use.**

Q. Okay. Dr. Ford identified various medications -- Mellaril being one, Geodon being another -- that have warnings that every doctor knows about, every psychiatrist knows about and, yet, psychiatrists still prescribe those medications. And, in fact, you have testified you have prescribed Mellaril within the last year.

Have you prescribed Geodon within the last year?

**A. The Mellaril was -- was a year or more ago.**

204

Q. Okay.

**A. But Geodon, yes, within the past year.**

Q. And as well as other medications which have -- I mean, I assume every medication has warnings and cautions in some form or another.

**A. At least adverse reactions or something like that, yes.**

Q. And in each case I assume you go about the process of being aware of those warnings but then weighing the risks and benefits for each individualized patient.

**A. Sure.**

Q. And sometimes, despite that, despite you weighing the risk and benefits of -- for that individual patient, sometimes bad outcomes result even when you -- that weighed it all; is that true?

**A. Yes.**

Q. Would you agree with the statement: Bad outcomes can happen to the patient even when there is no breach of the standard of care?

**A. Sure.**

Q. Simply because a bad outcome results to a patient does not mean a doctor has disregarded a substantial risk.

**A. That's true.**

205

Q. Okay. In fact, would you agree that if a doctor actually weighs -- is aware of the risks, is aware of the benefits and weighs those risks and benefits, he is actually not disregarding those risks, by definition.

**A. I think if he is aware of the risks and weighs them for that particular patient and decides on it, then he's -- then he is -- yeah, then he's looked at the risks and examined them.**

Q. Okay. You have no information, based upon what you have read, no opinion, that Dr. Ford did anything to intentionally injure Ms. Jackson.

**A. I would hope not.**

Q. And that's not your opinion?

**A. No.**

Q. And, similarly, are you of the opinion Dr. Ford did anything to -- that he had malice in his heart and he was maliciously trying to injure her?

**A. I have no evidence at all of that.**

Q. I hate to harp on this, but I want to go back one more time and ask you about issues involving your litigation experience.

**A. Uh-huh.**

Q. You are obviously charging $600 an hour for this case; correct?

Wright Watson and Associates, L.L.C.
512-474-4363

52 (Pages 202 to 205)

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1

206

A. **Right.**
Q. Does that money go to you or to Methodist Hospital?
A. **Me.**
Q. In all of the cases that you have that you are reviewing in a given year, 25 -- 20 to 25 in a given year --
A. **Uh-huh.**
Q. -- do you charge $600 per hour in each of those cases?
A. **Yes.**
Q. And how long has that been the case?
A. **I think my -- my office manager raised my fees last year, maybe.**
Q. And --
A. **Oh, and by the way, that's not entirely true. There's been an indication when I have agreed to do a case that is particularly interesting at a different fee. I think the one with the Attorney General's Office may have been, for example; but it's pretty rare.**
Q. You said that you are currently doing 20 to 25 case a year. How long -- or I'm sorry. You're reviewing that many.
A. **Uh-huh.**
Q. How long has been the case?

207

A. **That's hard to say because it fluctuates so much. You know, a number of them I turn down when the review is -- you know, it may take me a half hour to review it and say: "Nope. Sorry. I don't want to do it," or "I don't think you've got a case." So I don't -- It's hard for me to say.**
Q. Do you have any way to gauge for us what percentage of your income is based upon litigation versus the practice of medicine?
A. **That's pretty hard. I can -- I can estimate my time, and I guess we can figure it out maybe from that. I'd say probably 10 percent of my time, maybe 15 percent in a busy year, is forensic stuff; and that fee is about twice what I charge in my office.**
Q. And I think you said -- and I want to make sure I get this right.
A. **Uh-huh.**
Q. I think earlier you said you probably spend five to ten hours a week doing litigation; is that correct?
A. **Doing forensic psychiatry, which is mostly going to be litigation or -- I guess when I was teaching more, it included that, too.**
Q. And so if we assume, we'll say, five to ten hours a week --

208

A. **Some weeks and other weeks there's none.**
Q. -- at -- at $600 a week -- $600 an hour --
A. **Yeah.**
Q. -- we're looking at 3,000 to 6,000 a week in litigation; correct?
A. **It's not that much. I wish it were, but it's not that much.**
Q. Okay. So you think it's less than five to ten hours a week?
A. **Average, it might be five hours a week, maybe. But I know it's not that much a week.**
Q. So in any given week, approximately 3,000 or more dollars per week made doing litigation work?
A. **(Nods head affirmatively.) Maybe. Yeah.**
Q. So up to $150,000 or more every year doing litigation?
A. **Oh, that would be nice. I don't think that's right either. I really can't tell you. I mean, some years probably so.**
Q. Okay. Some years more than that, some years less than that?
MR. LYONS: Objection, form.
A. **I'm not sure if any year I've made more than that in forensic work.**
MR. STARR: I'll pass the witness.

209

FURTHER EXAMINATION

BY MS. CASAS:
Q. Dr. Ray, I just have a couple questions. I touched on it last time, but I want to make sure I get an answer to this specific question.
A. **Okay.**
Q. Do you believe you have training and experience -- enough training and experience in pharmacy or pharmacology to offer an opinion on the actions of a pharmacist?
A. **I suppose in only a very limited way; and that is that if they're -- if the hospital rules, for example, require them to notify me of something and they don't do it --**
Q. Okay.
A. **-- I can say that falls below the hospital standards.**
Q. Okay.
A. **In terms of the training, stuff like that, no.**
Q. Okay. And do -- I think I did ask you, but you don't intend to offer an opinion as to the actions of the pharmacist in this case; do you?
A. **No.**
Q. Do you intend to offer any testimony as to the

EXHIBIT F

5ce5c018-78c5-4b44-aebd-7206818c20a1