1 (Pages 1 to 4)

John S. Ford
January 31, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

REGINA JACKSON AND )
RUDOLF WILLIAMSON, )
INDIVIDUALLY, AND ON )
BEHALF OF THE ESTATE OF )
RACHEL JACKSON, DECEASED )
)
VS. ) CIVIL ACTION NO. A10CA522 SS
)
JOHN S. FORD, M.D., AND )
TRAVIS COUNTY, TEXAS )

*******************************************************
ORAL DEPOSITION OF
JOHN S. FORD, M.D.
JANUARY 31, 2011
*******************************************************

ORAL DEPOSITION OF JOHN S. FORD, M.D., produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 31st of January, 2011, from 9:49 a.m. to 1:57 p.m., before Lisa Minister, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Germer Gertz Beaman & Brown, 301 Congress Avenue, Suite 1700, Austin, Texas, pursuant to the Federal Rules of Civil Procedure.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Sean M. Lyons
HENDLERLAW, P.C.
1301 West 25th Street, Suite 400
Austin, Texas 78705

FOR THE DEFENDANT JOHN S. FORD, M.D.:
Mr. Paul Byron Starr
GERMER GERTZ BEAMAN & BROWN, LLP
301 Congress Avenue, Suite 1700
Austin, Texas 78701

FOR THE DEFENDANT TRAVIS COUNTY, TEXAS:
Ms. Jennifer Kraber
Ms. Elaine Casas
TRAVIS COUNTY ATTORNEY'S OFFICE
314 West 11th Street, Suite 420
Austin, Texas 78701

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 3

INDEX

JOHN S. FORD, M.D.

| | PAGE |
|---|---|
| Examination by Mr. Lyons | 4 |
| Examination by Ms. Kraber | 106 |
| Examination by Mr. Starr | 119 |
| Further Examination by Mr. Lyons | 121 |
| Further Examination by Ms. Kraber | 127 |
| Further Examination by Mr. Starr | 127 |
| Changes & Signature Page | 132 |
| Reporter's Certificate | 134 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | CV | 17 |
| 2 | Records | 46 |
| 3 | Novartis - Mellaril | 73 |
| 4 | Thalomid | 131 |
| 5 | Accutane | 131 |

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 4

JOHN S. FORD, M.D.,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. LYONS:
Q. Tell us your name, please.
A. Dr. John Ford.
Q. Dr. Ford, have you ever had your deposition taken before?
A. Yes.
Q. How many times?
A. A fair number of times.
Q. I'll go through that with you in just a moment, but when was the last time?
A. Over 10 years ago.
Q. Let me refresh you about some of the protocols.
[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

2 (Pages 5 to 8)

John S. Ford
January 31, 2011

Page 5

[redacted]

Q. Have you ever been deposed as an expert witness?
A. Yes.
Q. Let's start with those. How many times do you

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 6

think you've been deposed as an expert?
A. I wouldn't be able to count. It happened fairly often when I was in Texarkana.
Q. Were there instances in which you were asked to serve as an expert witness in a civil lawsuit like the one we're in now?
A. I believe, yes.
Q. Were there also instances in which you were asked to serve as an expert in criminal cases?
A. I believe so.
Q. As well as civil commitment procedures?
A. Yes.
Q. Other kind of procedures?
A. I don't think I was ever deposed in a commitment procedure.
Q. That's more rare. Criminal is probably rare that you were deposed as well, too. Is that fair to say?
A. It's been a long time, and I really don't remember.
Q. Let's just talk about circumstances where you might have been retained as an expert witness in a civil lawsuit. How many times do you think that might have happened?
A. Again, I can't tell you with certainty, but

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 7

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 8

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

6 (Pages 21 to 24)

John S. Ford
January 31, 2011
Page 21

Q. Is lithium the kind of drug that doctors are concerned that patients might pass around and share?
A. No. Well, let me correct that. In a prison system, any drug will be passed around.
Q. But the severe limitations are mostly concerned with those more likely to be passed around and made profit from, correct?
A. Right. There's significant trafficking and other major problems with some drugs, but any drug is -- the best way I could say it is some people are so naive that they will take anything that's offered to them and take the word of the person offering it.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011
Page 22

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011
Page 23

Q. Tell me about the Texarkana Chapter American Depressive & Manic Depressive Association. It looks like you were a cofounder and sponsor. Did you start that chapter?
A. I and some of my parents together set this up. There had been a national organization and people wanted to develop a support group. So that's what happened.
Q. What is the Miller-Bowie County Medical Society?
A. Texarkana is essentially one city but it straddles the state line. County medical societies are set up state by state. So what they did in Texarkana is combine the Bowie County Texas Medical Society meetings and the Miller County Arkansas Medical Society meetings into one organization.
Q. How long did you serve as president?

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011
Page 24

A. One year.
Q. You are board certified?
A. Yes.
Q. In what?
A. Psychiatry.
Q. And that's in both Texas and Arkansas?
A. Board certification is a national phenomena.
Q. I see under "medical licenses" it says, "Board certified physician, State of Texas." Are you combining your --
A. Actually, that might also be changed because board certification has nothing to do with state licensing.
Q. Okay. Do you have only one board certification, and it's in psychiatry?
A. I have only one board certification and it is in psychiatry.
Q. What was the period of your contract with the Travis County Correctional Complex?

Stratos Legal Services
800-971-1127

EXHIBIT I

7 (Pages 25 to 28)

John S. Ford
January 31, 2011

Page 25

A. October of 2002 to October of 2010.
Q. And is it correct that that was by a contract?
A. That was by contract.
Q. Did you ever consider yourself an employee of Travis County Correctional Complex?
MS. CASAS: Objection. Calls for speculation.
Q. (By Mr. Lyons) When that happens, you can go ahead and answer.
A. I never considered myself an employee of Travis County.
Q. Did you consider yourself an independent contractor?
A. Yes.
Q. And did the contract with Travis County -- did that eight-year period -- eight or so years, was that all under one contract or did it have to be renewed?
A. It had to be renewed each year.
Q. Every year?
A. Yes.
Q. Did your title -- first of all, was there any title other than independent contract that went along with that job?
A. I don't think so.
Q. They never called you director of psychiatric

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 26

ward or something like that?
A. No.
[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 27

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 28

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

8 (Pages 29 to 32)

John S. Ford
January 31, 2011

Page 29

Q. Does your medical degree over the years require a certain amount of continuing education?
A. It has.
Q. Have you ever had continuing education specific to providing psychiatric care in an institutional setting?
A. Yes.
[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 30

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 31

[redacted]
Q. Was there any formulary that applied to you as a psychiatrist working for Travis County?
A. Were there any --
Q. Was there a formulary?
A. We did have a formulary.
Q. Describe that to me. First of all, in what way did it differ from the formulary provided by UTMB?
A. We were free to prescribe whatever appropriate medications were required for the inmates. We still had the limitation of no benzodiazepines, no narcotics, no amphetamines, but we were allowed to use legitimate drugs at our discretion.
[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 32

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

## Page 41

John S. Ford
January 31, 2011

[content redacted lines 1-16]

17  Q. What does it mean to prescribe a drug off
18  label?
19  A. Prescribing off label means prescribing a drug
20  for a purpose that had not been approved by the federal
21  government.
22  Q. What does the term "contraindicated" mean to
23  you?
24  A. Contraindicated is a relative term meaning
25  there are reasons that you might not want to use this

Stratos Legal Services
800-971-1127

## Page 42

John S. Ford
January 31, 2011

1  drug. There are relative contraindications and absolute
2  contraindications.
3  Q. How does the FDA make it clear whether a drug
4  is strictly contraindicated versus relatively
5  contraindicated?
6      MR. STARR: Objection. Vague and
7  ambiguous.
8  A. You have to read the information that the drug
9  companies provide based on what the FDA tells them, and
10  if it is an absolute contraindication, it will say
11  absolute contraindication. This must not be prescribed.
12  If it is a relative contraindication, it will say there
13  are problems if you do this and this and therefore you
14  must take appropriate precautions or be aware that such
15  and such might happen.
16  Q. (By Mr. Lyons) Does prescribing a drug in a
17  manner for which it is contraindicated, is that the same
18  thing as using a drug off label, or would that be mixing
19  the terms inappropriately?
20  A. That's not exactly the same thing. I'm
21  wondering if we could take a break at this time?
22  Q. Sure.
23      MR. LYONS: Let's go ahead and take a
24  break.
25      (Recess from 10:54 a.m. to 11:03 a.m.)

Stratos Legal Services
800-971-1127

## Page 43

John S. Ford
January 31, 2011

1  Q. (By Mr. Lyons) Do you remember Rachel Jackson?
2  A. Yes.
3  Q. What do you remember about her, your first
4  recollection of treating her?
5  A. I remember that when I first saw her, she was a
6  person that I had seen in the past. I knew, however,
7  that there was another person named Rachel Jackson and
8  some other people named Jackson. So I wasn't a hundred
9  percent clear who was who.
10  Q. When you first saw her, you recall you saw her
11  in the past. Let's talk about that period when you
12  first saw her. Are you talking about around July 15th,
13  2008?
14  A. Yes.
15  Q. And we're going to be discussing mostly that
16  admission that began July 15th, 2008, and ended in her
17  death on July 21st. Okay?
18  A. Yes.
19  Q. What do you remember about when you first saw
20  her for that admission?
21  A. I remember she was quite psychotic and
22  inappropriate.
23  Q. What specifically was she doing and saying?
24  A. I can't remember specifically what she was
25  doing or saying.

Stratos Legal Services
800-971-1127

## Page 44

John S. Ford
January 31, 2011

1  Q. How was she dressed?
2  A. In prison clothes or jail clothes. Black and
3  white striped.
4  Q. So you remember that she was psychotic
5  and inappropriate?
6  A. Let me rephrase. That's most likely how she
7  was dressed when she was dressed. She was also at some
8  times probably dressed either in a paper gown and
9  possibly even sometimes without it. I don't remember
10  specifically.
11  Q. How many times did you visit with her
12  face-to-face during this period of time from July 15th
13  to July 21st?
14  A. I think I saw her once daily on the 15th, 16th,
15  17th, and 18th.
16  Q. What time of day was it?
17  A. I can't be absolutely sure, especially with any
18  time that I saw her downtown, but if she was at Travis
19  County Correctional Complex, it would be most likely in
20  the morning.

[remainder redacted]

Stratos Legal Services
800-971-1127



EXHIBIT I

12 (Pages 45 to 48)

John S. Ford
January 31, 2011

Page 45

and it's likely that I saw her downtown.
Q. Okay.
A. Somewhere in there she moved out to Del Valle, and I don't remember what day it was.
Q. When you say "Del Valle," that's the same thing the TCCC?
A. Travis County Correctional Complex.
Q. Do you remember where she was when you saw her on the 16th?
A. I'm not absolutely sure about the 15th and 16th. The 17th and 18th I'm virtually certain that she was at Travis County Correctional Complex.
Q. Where in the Travis County Correctional Complex was she when you visited with her on the 17th and 18th?
A. In one of the slick cells.
Q. Say that again.
A. In one of the slick cells.
Q. What is meant by "slick cells"?
A. They are the cells that have all four walls and floor padded with foam rubber.
Q. Do you remember anything specific about her behavior or anything she said on the 16th when you visited with her?
A. I can't recall specifically.
Q. What about on the 17th? Anything specific you

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 46

remember about her behavior or what she said?
A. No.
Q. What about on the 18th?
A. Without looking at the record, I would have a hard time remembering anything specific about those.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 47

Q. (By Mr. Lyons) Doctor, I'm going to ask you to look at Exhibit Number 2 and tell me, the first page, which is Bates stamped 2450188, is there some handwriting here that's yours?
A. Yes.
Q. So is this a record that you've created?
A. This is a record I've created.
Q. And what's the date of this record?
A. The date of this record is July 18, 2008.
Q. Let me just ask you to go ahead and read the writing in here that is yours starting with the beginning of it that is yours.
A. "It's helping me with my mood swings. Officer spoke with her at length yesterday. Now taking meds. Schizophrenia. Discontinue full suicide precautions. Move to psych lockdown. Mellaril 100 milligrams HS times 30 days AR times 11. Non KOP. Appointment 7-23-08. John S. Ford, M.D."
Q. All that you read there, that was your handwriting, correct?
A. That was my handwriting.
Q. This handwriting on the bottom right is a little bit different. Do you know what that refers to?
A. Yes. It refers to charges. She was to be charged $10 for the visit and $2.00 for the pill

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 48

prescription.
Q. That first portion where you said "It's helping me with my mood swings," is that a quote from the patient?
A. That is a quote from the patient.
Q. Do you know what she was referring to?
A. She was referring to the medications that she was being given.
Q. And the medications at that point on July 18th before you prescribed the Mellaril were Abilify and Risperdal?
A. Yes.
Q. At the time you met with her on the 18th and obtained that quote from her among other things, do you know where she was when you met with her?
A. At that time she was in 3VC1, which is one of the slick cells.
Q. And at that time she was on full suicide precautions?
A. Yes, she was.
Q. Where did you choose to discontinue full suicide precautions?
A. Because she appeared to be rational at that time, and there did not appear to be a reason to continue full suicide precautions.

Stratos Legal Services
800-971-1127

EXHIBIT I

14 (Pages 53 to 56)

John S. Ford
January 31, 2011

Page 53

[redacted]

Q. When is the last time you reviewed any of her medical records? Did you get a chance to review them before you came to take this deposition?
A. I reviewed medical records probably Friday.
Q. Is there anything you remember about Rachel Jackson's behavior or appearance or things that she said that was not contained in the medical records?
A. Not specifically.
Q. What about generally?
A. Generally I could say that when I first saw her, and I believe up till that Friday she seemed not in her right mind, her behavior was out of control, and on that Friday she seemed much more calm, collected, and rational.
Q. Anything else that you generally recall about Rachel that your review of the medical records doesn't exactly reflect perfectly?
A. I can't remember anything specific.
Q. Why on July 18th did you decide to prescribe to her thioridazine?

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 54

A. She had been on medications, and to the best of my knowledge these medications had not controlled her mental illness and that she had had a severe relapse, which resulted in her being put in jail. She was on a near maximum dose of one of the medications. The other medication, the next increase was probably to the maximum dose, and it didn't seem likely that these meds by themselves would prevent a future relapse. So I was adding the medication with the plan of switching her to a more effective antipsychotic agent.
Q. What more effective antipsychotic agent were you thinking of switching her to?
A. Mellaril.
Q. To continue on Mellaril indefinitely?
A. Right.
Q. In addition to other medications or just exclusively?
A. No. Once I had the Mellaril started, I would back off on the other two medications.
Q. What was your understanding in July of 2008 of what you would need to do to safely prescribe a patient Mellaril? What term do you prefer? Mellaril or thioridazine?
A. Mellaril is what's commonly said. It's easier to say.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 55

Q. Let's call it Mellaril, then, and we'll know that we are talking about the same thing, even though I think it was only generic form at this point, right?
A. Right.
Q. So what did you understand that as a psychiatrist you needed to do to make sure she could safely take Mellaril?
MR. STARR: Objection. Vague and ambiguous.
A. Mellaril has been a drug that's been on the market for 50 years. I used it extensively over that period of time, and although a caution came out probably eight, 10 years ago about its prolongation of QTc interval, this caution seemed overly broad and the recommendation of doing electrocardiograms and electrolytes hadn't seemed necessary for the first 40 years of its use, and it seemed an extreme precaution. So I kept in mind that that was in existence and that was true for Mellaril, and we knew that as years passed, they were saying the same things are happening with other drugs. It seemed to me that at the low doses that we were using, these things were not necessary.

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 56

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I



A. No. What I'm saying is that this drug was in use for 40 years before this was ever discovered. There was no indication of an unusual death rate or problem with it. There were only sporadic cases, and the precautions seem more related to protecting drug companies from lawsuits than from providing competent care. If it were otherwise, the drug would have been pulled from the market or it would have had very specific statements about it such as if you prescribe this, you cannot prescribe this unless.

EXHIBIT I

24 (Pages 93 to 96)

John S. Ford
January 31, 2011
Page 93

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011
Page 94

[redacted]

Q. Before you left for the weekend, did you leave any instructions to any nurse or anybody else to keep a special watch out for Rachel?
A. No.
Q. What expectations or assumptions did you have of the nurses providing the drug to Rachel with regard to their understanding for the warnings that went along with it? Specifically, did you expect the nurses giving the drugs to Rachel to understand the warnings?
A. No.

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011
Page 95

[redacted]

Q. What is your understanding of what the protocol was July of 2008 when a patient would have complained of chest pain?
A. My understanding was that if a patient complained of chest pain, they would be evaluated by the medical department.

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011
Page 96

[redacted]

Q. Do you intend to share any opinion on the cause of Rachel Jackson's death?
A. I don't know the answer to that.
Q. Do you have an opinion as to what caused her death?
A. Yes, I do.
Q. What is it?
A. I think she died of respiratory failure.
Q. What caused her respiratory failure, in your mind?
A. There are two factors that seem involved. One was a brain tumor that was causing anatomical disruption of the brain, and the other was the obstruction of her breathing by a pillow that some of these reports say her face was buried in at the time of death.

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

28 (Pages 109 to 112)

John S. Ford
January 31, 2011

Page 109

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 110

Does that answer your question?

Q. Yes. But mainly I'm just trying to get at when you say "we discussed the formulary at Travis County," this was -- is this something the sheriff would have given you rules on?

A. The sheriff has never interfered in the

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 111

provision of medical care. It would not be his place to do that. He wouldn't do that any more than any other things, I guess. This is just the things that the providers or practitioners would do. It's run much the same way as it is done in a hospital.

Q. Just a few questions I have to go over that. Does the sheriff instruct you on how to practice medicine regarding specific decisions --

A. Of course not.

Q. -- concerning patient treatment?

A. No.

Q. Did the sheriff ever direct you on any of your doctor/patient consultations?

A. No.

Q. Did the sheriff or Travis County commissioners tell you how to prescribe medicines as a physician?

A. No.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 112

Stratos Legal Services
800-971-1127

EXHIBIT I

29 (Pages 113 to 116)

John S. Ford
January 31, 2011

Page 113

[redacted]

Q. Okay. Are you an official policy maker for the Travis County --
A. No.
Q. -- Sheriff's Office? Who is the official policy maker?
A. I have no idea.
Q. Okay.
A. It's definitely not me.
Q. Just to go over a few questions in case I didn't fully understand them concerning Rachel Jackson. Did you know of any long-term illnesses that she suffered from?
A. She had suffered from a long-term psychiatric illness. That's the only thing I knew of. It was variously described as schizophrenia or bipolar disorder, and she had used drugs in the past.
Q. Okay. So you were aware that she had some

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 114

substance abuse?
A. I was aware of those things.

[redacted]

Q. And just so I'm correct, your diagnosis of her

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 115

on the page that we looked at before was schizophrenia? That was your diagnosis?
A. Correct.
Q. Okay. And what kind of treatment would you normally prescribe for schizophrenia?
A. I normally prescribe medications such as Abilify, Risperdal, Mellaril, and a whole bunch of other ones that are antipsychotic agents.
Q. Okay. And in this case, did you have any concerns about prescribing Mellaril?
A. No, I didn't.
Q. Did you notify or alert anyone in the jail about the risk of those medications?
A. No.
Q. When was the last time you saw Ms. Jackson?
A. Friday, the 18th of July.
Q. That was the time when you decided to discontinue the full suicide precautions --
A. Yes.
Q. -- that we were looking at earlier?
A. Yes.
Q. And at that time, was she making any other complaints besides saying that the medication was helping with her mood swings?
A. No.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 116

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

30 (Pages 117 to 120)

John S. Ford
January 31, 2011

Page 117

[redacted]

Q. Okay. If Diana Gonzalez, the pharmacist at Travis County, said that after Rachel Jackson's death it was discussed performing EKGs before prescribing Mellaril, would you disagree with that?

A. I'm not remembering anything about that very well. So I don't know. If we've got it down in writing, then I would say I'm sure it happened.

Q. Okay.

A. I just don't remember.

Q. Regardless, Travis County Sheriff's Office or Travis County commissioners would not have prohibited you from performing an EKG?

A. No.

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 118

Q. And they would not have denied you doing potassium level checks?

A. Absolutely not.

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 119

[redacted]

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 120

[redacted]

Stratos Legal Services
800-971-1127

EXHIBIT I

34 (Pages 133 to 135)

John S. Ford
January 31, 2011

Page 133

I, JOHN S. FORD, M.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________
JOHN S. FORD, M.D.

THE STATE OF _________ )
COUNTY OF _________ )

Before me, ___________________, on this day personally appeared JOHN S. FORD, M.D., known to me or proved to me under oath or through ______________ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____________, ______.

__________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ___________

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 134

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS

REGINA JACKSON AND )
RUDOLF WILLIAMSON, )
INDIVIDUALLY, AND ON )
BEHALF OF THE ESTATE OF )
RACHEL JACKSON, DECEASED )
)
VS. ) CIVIL ACTION NO. A10CA522 SS
)
JOHN S. FORD, M.D., AND )
TRAVIS COUNTY, TEXAS )

REPORTER'S CERTIFICATION
DEPOSITION OF JOHN S. FORD, M.D.
TAKEN ON JANUARY 31, 2011

I, LISA MINISTER, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOHN S. FORD, M.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on __________________ to the witness or to the attorney for the witness for examination, signature and return to me by ______________________;

That the amount of time used by each party at the deposition is as follows:

Mr. Sean M. Lyons - 02:52

Stratos Legal Services
800-971-1127

John S. Ford
January 31, 2011

Page 135

Ms. Jennifer Kraber - 00:23
Mr. Paul Byron Starr - 00:10

That pursuant to the information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Sean M. Lyons, Attorney for Plaintiffs
Mr. Paul Byron Starr, Attorney for Defendant John S. Ford, M.D.
Ms. Jennifer Kraber and Ms. Elaine Casas, Attorneys for Defendant Travis County, Texas

That $___________ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of February, 2011.

Lisa Minister
LISA MINISTER, Texas CSR
Expiration Date: 12-31-2011
Stratos Legal Services, L.P.
Firm Registration No. 484
4295 San Felipe, Suite 125
Houston, Texas 77027
713.481.2180

Stratos Legal Services
800-971-1127

EXHIBIT I