IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2011 DEC -6  AM 8: 28

BY _____ ✓

REGINA   JACKSON   and   RUDOLF
WILLIAMSON, Individually and on Behalf of the
Estate of Rachel Jackson, Deceased,
                              Plaintiffs,

-vs-                                                          Case No.  A-10-CA-522-SS

JOHN S. FORD, M.D. and TRAVIS COUNTY,
TEXAS,
                              Defendants.

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Travis County, Texas's Motion to Dismiss [#34], Plaintiffs Regina Jackson and Rudolf Williamson (Jackson)'s response [#39] thereto, Travis County's reply [#40], and Jackson's Motion for Leave to File Surreply [#45]; Jackson's Motion for Leave to File First Amended Complaint [#42], Travis County's response [#43] thereto, and Jackson's reply [#46]; Defendant John S. Ford's Motion for Summary Judgment [#52], and Jackson's response [#66] thereto; Travis County's Motion for Summary Judgment [#55], Jackson's response [#65] thereto, and Travis County's reply [#74]; Jackson's Motion to Take the Oral Deposition of Russell Marburger [#60], Travis County's response [#63] thereto, and Jackson's reply [#64]; and Travis County's Motion to Quash and For Protective Order [#62], and Jackson's response [#64] thereto.

Having reviewed the documents, the relevant law, and the file as a whole, the Court now enters the following opinion and orders DENYING Jackson's motion for leave to amend; GRANTING IN PART and DENYING IN PART Ford's motion for summary judgment; GRANTING IN PART and DENYING IN PART Travis County's motion for summary judgment; DENYING Jackson's motion to take the oral deposition of Russell Marburger; and DISMISSING AS MOOT Travis County's motions to dismiss and to quash.

At the outset, the Court addresses two preliminary matters.  First, the Court DENIES Jackson's motion for leave to amend her complaint.[1]  The Court entered a scheduling order in this case on December 8, 2010, in which it set a deadline of March 16, 2011, for the filing of amended pleadings.  Likewise, the scheduling order set a discovery deadline of September 26, 2011, with a docket call on December 9, 2011, and trial in January 2012.  Jackson filed her motion for leave to amend on September 12, 2011, approximately six months after the amendment deadline, and two weeks prior to the discovery deadline.

Jackson argues her motion should be granted because it cures defects identified in Travis County's motion to dismiss, and it would be unjust to grant Travis County's motion without giving her an opportunity to amend.  Whether Jackson's argument would justify an amendment so late in these proceedings is questionable, but ultimately irrelevant; as the Court noted above, it is dismissing Travis County's motion to dismiss.  To the extent Jackson's case is deficient, it shortcomings are not in her inability to formulate proper causes of action, but in her inability to provide factual support

---

[1] This case is brought by Plaintiff Regina Jackson, and concerns the death of her daughter, Rachel Jackson. To differentiate between decedent Rachel Jackson, and Plaintiff Regina Jackson, the Court will refer to Rachel Jackson as "Rachel Jackson" or "Ms. Jackson" throughout this opinion, and will refer to Regina Jackson as "Regina Jackson" or simply "Jackson."

for them.  Because of Jackson's unjustifiable delay, and because her proposed amendments would be futile, the Court denies Jackson's motion for leave to amend.

Second, the Court DENIES Jackson's motion for leave to take the oral deposition of Russell Marburger.  This motion was filed on October 20, 2011, well past not only the discovery deadline of September 26, 2011, but also the dispositive motions deadline of October 3, 2011.  Further, by Jackson's own admission, Marburger's deposition was scheduled to take place on July 20, 2011, but Jackson herself cancelled it because of a discovery dispute with Defendants.  While the Court encourages parties to resolve discovery problems between themselves when possible, this does not excuse lawyers from timely bringing matters to the Court's attention when necessary.  There is simply no justification for Jackson's several-month delay in filing this motion, particularly when the underlying issues were known to her in July, and she could easily have raised her concerns prior to the end of discovery.

Finally, the Court notes Marburger's expected testimony seems to be of little relevance to the dispositive issues in this case, particularly in light of the extensive evidentiary record before the Court on the parties' motions for summary judgment.  There is little question both sides have had ample opportunities to discover relevant facts, and have taken advantage of those opportunities.  Accordingly, Jackson's motion for leave to take the oral deposition of Russell Marburger is denied, and Travis County's responsive motion to quash is dismissed as moot.

**Background**

Plaintiff Regina Jackson brings suit against Dr. John S. Ford and Travis County for their alleged roles in the July 21, 2008 death of her daughter, Rachel Jackson, while Ms. Jackson was in the custody of the Travis County Correctional Complex.  Jackson asserts medical and general

negligence claims, as well as claims under 42 U.S.C. § 1983, alleging Defendants were deliberately indifferent to the substantial risk of serious medical harm to Ms. Jackson, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.   Jackson seeks compensatory damages on her own behalf, and on behalf of Ms. Jackson's estate.  For the following reasons, the Court concludes there is no genuine dispute of material fact regarding whether Ford acted with deliberate indifference, or whether an official policy or custom of Travis County directly caused any deprivation of Ms. Jackson's constitutional rights.  Defendants are therefore entitled to judgment as a matter of law on Jackson's § 1983 claims.  However, the Court finds there are genuine disputes of material fact regarding Jackson's state law negligence claims, making summary judgment inappropriate as to these causes of action.

## I.   Factual Background

The following facts are undisputed, unless otherwise noted.  In the early morning hours of July 15, 2008, Rachel Jackson was arrested by the Austin Police Department for creating a "public disturbance,"[2] and was taken to Brackenridge Hospital for evaluation.  Ms. Jackson's triage record indicates she was not answering questions, and may have ingested PCP.  Travis County's Mot. Summ. J. (TCMSJ) [#55], Ex. B-4 at 2450631.  Ms. Jackson's records further indicate she had a history of "cognitive impairment," and was experiencing both hallucinations and acute agitation. *Id.* at 2450637.  She was noted as being uncooperative and combative, in moderate distress, and tachycardic, with a heart rate in the 130's. *Id.* at 2450638–39.  Ms. Jackson's heart rate slowed over time, *id.* at 2450632, apparently reaching the low 80's before she was discharged, *id.* at 2450639.

---

[2] Travis County describes this "public disturbance" in greater detail; however, as the particulars are not legally significant, and are potentially embarrassing to the Jackson family, the Court omits them, except to note it appears APD had ample reason to take Ms. Jackson into custody and subsequently to bring her to Brackenridge Hospital.

Although the Court was unable to identify the lab work apparently ordered by Brackenridge Hospital staff, the Travis County Medical Examiner's report indicates those records listed Ms. Jackson's sodium level as "133" and her potassium level as "3.0";[3] according to the deposition testimony of Chief Medical Examiner Dr. David Dolinak, these levels are indicative of mild hypokalemia (a low potassium level in the blood) and hyponatremia (low sodium). Pls.' Resp. [#65], Ex. D at 95:2–18. During her admission, Ms. Jackson was given 2,000 cubic centimeters of intravenous saline solution. TCMSJ, Ex. B-4 at 2450600, 2450636. Ms. Jackson was discharged from Brackenridge Hospital the same day, and was returned to the custody of the Travis County Jail, where she underwent an "Intake Health Screening" at 8:00 a.m. *Id.* at 2450614.

Records from Ms. Jackson's intake screening indicate her pulse was regular, at a rate of 118 beats per minute. *Id.* Ms. Jackson was described as "still high, but oriented and generally appropriate although very loud and labile." *Id.* Records indicate Ms. Jackson was referred to a counselor at that time, *id.*, and subsequently placed in an "isolation cell" for observation "for safety of harm to herself," *id.*, Ex. B-3 at 2450547.

Travis County Sheriff's Office (TCSO) Counselor Paul Parsons subsequently met with Ms. Jackson, but noted that, because of her PCP use, her "ability to accurately discuss her mental health history was limited." *Id.*, Ex. B-4 at 2450620. Parsons noted Ms. Jackson reported taking Abilify, Depakote, and Trazadone, at unknown times and in unknown dosages, "for a psychiatric purpose." *Id.* Parsons further observed Ms. Jackson was agitated, and presented with depressed affect. *Id.* at

---

[3] Although the report does not include the units associated with those measurements, the National Institutes of Health website suggests milliequivalents per liter (mEq/L) is most likely. *See, e.g.*, Nat'l Insts. of Health, *Potassium Test*, MEDLINEPLUS MEDICAL ENCYCLOPEDIA, http://www.nlm.nih.gov/medlineplus/ency/article/003484.htm (last updated Nov. 7, 2011) (indicating 3.7 to 5.2 mEq/L is a normal range of potassium concentration in the blood).

2450621. He further reported that, although Ms. Jackson denied any suicidal thoughts or intent to harm herself, and had verbalized no desire for self-harm, her chronic substance abuse was a risk factor for suicide. *Id.* at 2450621–22. Finally, Parsons flagged Ms. Jackson as a "Psych Special Needs Inmate" and as having a "Priority Population Diagnosis," recommended a psychiatric follow-up, and recommended a psychological observation housing assignment. *Id.* at 2450625. Ms. Jackson's "Single Cell Status Sheet" indicated she was placed on full suicidal observation, with visual observation every thirty minutes. *Id.*, Ex. B-3 at 2450583.

At approximately 1:00 p.m. on July 15, 2008, Dr. Ford examined Ms. Jackson, noting she appeared "confused," and assessing her as schizophrenic. *Id.*, Ex. B-4 at 2450611. In his deposition, Ford recalled Ms. Jackson "was quite psychotic and inappropriate" during this examination. Pls.' Resp. [#65], Ex. A at 43:15–22. In his records, Ford indicated his plan following the examination was to obtain Ms. Jackson's old medical records, and in the meantime to move her to "psych lockdown." TCMSJ, Ex. B-4 at 2450611. Ford also prescribed Ms. Jackson Abilify and Risperdal, two antipsychotic medications, and scheduled a follow-up appointment for the next day, July 16, 2008. *Id.*

At approximately 1:48 p.m. on July 15, 2008, Counselor Parsons met once again with Ms. Jackson, at her request. *Id.* at 2450601, 2450619. Parsons reported that Ms. Jackson recalled neither Dr. Ford's recent examination, nor Parsons's own prior visit. *Id.* Parsons noted Ms. Jackson displayed escalating anger and confusion, and that, although she made threats of self-harm if she was not helped, Ms. Jackson declined to indicate what help she desired. *Id.*

Ms. Jackson's disruptive behavior continued into the evening of July 15, 2008. At 10:00 p.m., Registered Nurse Barbara Kelly entered a treatment record for Ms. Jackson, in which she

described Ms. Jackson's behavior:

> Inmate banging & acting out since aft. supper.  Started banging head—Dr. Ford
> notified for invol.  Sgt. Hutchinson here—inmate placed in chair.  Abilify 9.75 mg
> in rt. delt.  Cont. to scream and act out for abt. 1 hr.  Spit in officers face when officer
> in to check on her.  At this time in chair—asleep.  Cont. to monitor behavior.

*Id.* at 2450616.  This summary is described in more detail in the report of TCSO Officer T. Garcia.

*Id.*, Ex. B-3 at 2450573–74.

TCSO records indicate Ms. Jackson was transferred from the Travis County Jail to the Travis

County Correctional Complex (TCCC) at 11:45 p.m. on July 15, 2008.  *Id.*, Ex. B-4 at 2450601.

Documents, presumably from TCCC, indicated Ms. Jackson was to be kept on "full suicidal

precautions."  *Id.*, Ex. B-3 at 2450218; *see id.*, Ex. B-3 at 2450557.

On July 16, 2008, Dr. Ford again examined Ms. Jackson.  Ford mostly recounted the events

of the previous evening, noting Ms. Jackson had received an Abilify shot at that time, and scheduled

another follow-up appointment for the following day.  *Id.*, Ex. B-4 at 2450608.  TCSO records

indicate Ms. Jackson was "quiet," was suffering from "no distress," and had good affect on July 16,

2008.  *Id.* at 2450601, 2450630.

According to Ford's notes, his July 17, 2008 examination of Ms. Jackson was also fairly

uneventful: Ford noted an argument Ms. Jackson had with an Officer Thompson "about being treated

at Ash[4] or by Dr. Lee," indicated Ms. Jackson was receiving Abilify and Risperdal as ordered, and

again scheduled a follow-up appointment for the following day.  *Id.* at 2450607.  TCSO records note

Ms. Jackson was in "no distress" on July 17, that she was talking to staff, and was "pleasant," with

good affect.  *Id.* at 2450601, 2450630.

---

[4] Although it is not clear from Dr. Ford's notes, the Court assumes, based on Ms. Jackson's mental health history, this is likely a reference to Austin State Hospital.

The morning of July 18, 2008, also started calmly, with staff recording at 2:30 a.m. that Ms. Jackson was lying down, apparently asleep, and in no visible distress. *Id.* Nineteen minutes later, however, corrections officers delivered to Ms. Jackson, for her signature, a disciplinary hearing waiver regarding her outburst on the evening of July 15. *Id.*, Ex. B-3 at 2450594; *id.*, Ex. A-3 at 2450099. Shortly thereafter, at 3:20 a.m., Ms. Jackson stated her heart was racing, and TCCC staff notified medical personnel. *Id.*, Ex. B-3 at 2450594.

Nurse Andrew "Arnie" Waden arrived at 3:31 a.m. *Id.* In his deposition, Nurse Waden testified that, although he did not specifically remember performing this check on Ms. Jackson, the "[v]ital signs that would normally be checked under circumstances like this would be blood pressure and a pulse and a pulse oximetry and a respiration rate." *Id.*, Ex. C at 35:1–9, 45:13–15. Waden further testified he did not record his examination of Ms. Jackson on that occasion, but his policy was to document inmate assessments when "something [was] found to be out of the normal." *Id.* at 45:16–48:18. Similarly, Mike Summers[5] testified in his deposition that, if a nurse concluded an inmate in fact had a racing heart, as opposed to simply complaining of one, that information should have been included in the inmate's chart, and been conveyed to the incoming medical staff at the next shift change. Pls.' Resp. [#65], Ex. I at 124:11–125:13.

The remainder of July 18 appears to have been relatively peaceful, with reports of Ms. Jackson eating breakfast at 5:31 a.m., TCMSJ, Ex. B-3 at 2450594, and lunch at 9:30,[6] *id.*, Ex. B-4

---

[5] In the portion of Summers's deposition submitted to the Court, he testified he was "director of inmate services," but the precise entity for which he worked is unclear. The Court presumes Summers was employed by Travis County, either at the Sheriff's Office, or the Correctional Complex.

[6] The Court notes Ms. Jackson is elsewhere recorded as "eating chow" and "eating" at 10:12 a.m. and 10:26 a.m., respectively. TCMSJ, Ex. B-3 at 2450594. Whether this is an additional meal, or simply a timekeeping or recording error, is not clear.

at 2450630, with no unusual observations recorded by staff during their periodic visual observations, *id.*, Ex. B-3 at 2450594.

At 9:48 a.m. on July 18, 2008, Dr. Ford examined Ms. Jackson for the fourth and final time, prior to her death. *Id.*; *id.*, Ex. B-4 at 2450606. Ford's notes indicate Ms. Jackson was taking her prescribed medication, and she apparently reported it was helping with her mood swings. *Id.* Ford indicated Ms. Jackson should be discharged from full suicidal precautions, and moved to "psych lockdown," presumably a downgrade in the level of precautions. *Id.*, Ex. B-4 at 2450606. Notably, and according to the Travis County Medical Examiner's Report, perhaps tragically, Dr. Ford prescribed for Ms. Jackson a third antipsychotic medication, Mellaril. *Id.* In an affidavit, Ford stated Travis County medical staff did not tell him about Ms. Jackson's earlier complaint that her heart was racing, nor did Ms. Jackson make any similar complaint herself, during their appointment. Ford Mot. Summ. J. (FMSJ) [#52], Ex. A ¶ 6. Ford further stated that, if he had been made aware of these problems, or Ms. Jackson's subsequent complaints, he "would have taken affirmative action such as ordering an EKG, holding [Ms. Jackson]'s medications, or ordering electrolyte levels." *Id.* At the conclusion of his examination, Ford scheduled another follow-up appointment for July 23, 2008. TCMSJ, Ex. B-4 at 2450606.

Ms. Jackson's Mellaril prescription was filled by, but not personally dispensed by, TCSO pharmacy supervisor Diana Gonzalez. Pls.' Resp. [#65], Ex. F at 16:12–17, 43:12–44:1, 61:22–62:12. In her deposition, Gonzalez stated she did not specifically remember reviewing or filling Ms. Jackson's prescriptions. *Id.* at 77:8–14. Presumably relying on her general practices, Gonzalez further testified she did not send a message about potential drug interaction risks to those tasked with ultimately giving Ms. Jackson her medications, assuming such concerns would have

been considered and understood by her doctor. *Id.* at 62:2–63:7. Although Gonzalez said she did not remember the specific notices she may have received when filling Ms. Jackson's Mellaril prescription, she acknowledged the Travis County Jail System pharmacy used a computer system known as PRISM to identify drug interactions, and this system would have indicated a "level 2 drug-drug interaction" between Mellaril and Risperdal. *Id.* at 37:2–19, 40:21–42:2, 81:25–82:11; *id.*, Ex. F-1. Under the PRISM system, a "level 2" interaction is accompanied by the following warning: "Action is required to reduce the risk of severe adverse interaction." *Id.*, Ex. F-1. Gonzalez testified she assumed Dr. Ford knew what actions would be required to reduce the risk of an adverse reaction. *Id.*, Ex. F at 82:21–83:7. Finally, Gonzalez testified it was her decision to continue the University of Texas Medical Branch's processes, such that doctors were only informed of "level 1" interactions, which Gonzalez characterized as "true contraindications."[7] *Id.* at 142:6–25.

At some point between 7:00 a.m. and 3:00 p.m. on July 19, 2008, Ms. Jackson complained to Travis County Corrections Officer Alero Walker about chest pains, inability to breathe, and a feeling of claustrophobia. TCMSJ, Ex. H at 1–2; *id.*, Ex. A-3 at 2450136. Walker stated in an affidavit that many inmates feel claustrophobic in that particular cell because of its small size, and because inmates are only allowed out for one hour every day. *Id.*, Ex. H at 1–2. Walker further stated that, also like many inmates, Ms. Jackson calmed down when he opened the food chute to the cell, thus increasing air circulation and decreasing her feeling of restriction. *Id.* at 2. This statement is partially supported, and partially contradicted, by Walker's contemporaneous notes, which indicate Ms. Jackson settled down "for a little bit," but "continue[d] to press [the] intercom." *Id.*, Ex. A-3

---

[7] The PRISM system describes "level 1" interactions as follows: "Contraindicated Drug Combination: This drug combination is contraindicated and generally should not be dispensed or administered to the same patient." Pls.' Resp. [#65], Ex. F-1 at 2451091.

at 2450136.  Walker indicated he had been trained to contact medical personnel if an inmate complained about chest pains,  but he did not do so in Ms. Jackson's case because "her complaint that her chest was hurting was strung together with complaints about how small the room felt to her." *Id.*, Ex. H at 2.  Walker said that he would have contacted a nurse or doctor if he believed Ms. Jackson was suffering from a medical problem requiring care for her physical well-being.  *Id.* Walker's affidavit and the open psych status notes further indicate Ms. Jackson ate two meals on July 19, showered, received her hour outside the cell, and cleaned her cell.  *Id.*; *id.*, Ex. A-3 at 2450136.  Perhaps significantly, the boxes which counselors were supposed to initial after performing their daily visits to Ms. Jackson are blank, for both July 19 and 20, 2008.  *Id.*, Ex. A-3 at 2450136.  However, the open psych status notes for July 20, 2008, noted no complaints by Ms. Jackson, and indicate she again ate meals, showered, received an hour outside her cell, and cleaned her cell.  *Id.*

According to the Travis County Medical Examiner's report, Ms. Jackson was last seen responsive on July 20, 2008, at 9:10 p.m., when she was observed taking her medications.  Pls.' Resp. [#65], Ex. D-1 at 2600108.  Between that time, and when Ms. Jackson was found dead in her cell around 5:44 a.m. on July 21, 2008, staff appear to have recorded twenty-one "post visuals," *id.*, Ex. G at 2451955–57, during which Travis County policy requires "[o]fficers must ensure that they see a living, human body," TCMSJ, Ex. A-3 at 2450040.  Sadly, this policy obviously was not adhered to in Ms. Jackson's case.

At 5:44 a.m. on July 21, 2008, TCCC staff recorded a "medical emergency," indicating Ms. Jackson was "unresponsive."  Pls.' Resp. [#65], Ex. G at 2451957.  Nurse Woody Simmons was dispatched to Ms. Jackson's cell, where he found her "cold and stiff," clearly having been dead for

-11-

some time. TCMSJ, Ex. B-4 at 2450603. TCCC records indicate Ms. Jackson was in rigor mortis, and resuscitation was impossible. *Id.*, Ex. A-3 at 2450132. Ms. Jackson was pronounced dead by emergency medical personnel at approximately 6:07 a.m. *Id.*; *id.*, Ex. B-4 at 2450603.

According to the Medical Examiner's Report, Ms. Jackson's death may have been caused by the combination of Mellaril (a brand name for thioridazine), the two antipsychotic drugs she was already taking (Abilify, a brand name for aripiprazole; and Risperdal, a brand name for risperdone), and her mild hypokalemia. Pls.' Resp. [#65], Ex. D-1 at 2600102. The report indicates each of these drugs "may increase the QTc interval," and in combination they may lead to a fatal cardiac dysrhythmia,[8] particularly "in the setting of hypokalemia." *Id.* The report also notes each of the drugs rarely cause seizure, which alternatively may have caused Ms. Jackson's death. *Id.*

## II.   Defendants' Motions for Summary Judgment

Both Travis County and Dr. Ford move for summary judgment on all of Jackson's claims. Regarding Jackson's § 1983 claim, Travis County makes two arguments. First, it argues Jackson has failed to identify any official Travis County policy or custom that caused a deprivation of any of Ms. Jackson's constitutional rights. Second, Travis County claims Jackson has failed to demonstrate any such policy was the moving force behind the alleged deprivation of Ms. Jackson's constitutional rights. In response, Jackson argues the actions of various Travis County personnel directly led to Ms. Jackson's death, and were the result of customs so widespread as to be the equivalent of official policy. On this issue, the Court agrees with Travis County.

With respect to Jackson's state law negligence claims, Travis County argues it is entitled to sovereign immunity. Predictably, Jackson takes the contrary position. On the issue of her

---

[8] Cardiac dysrhythmia is a medical term for an irregular or abnormal heart rate.

negligence claims, the Court agrees with Jackson.

For his part, Dr. Ford argues he is entitled to summary judgment on Jackson's § 1983 claim because there is no genuine dispute of material fact on the issue of whether he acted with deliberate indifference. The Court agrees. With respect to Jackson's negligence claims, Ford argues they must be dismissed for failure to comply with the expert report requirements of Texas Civil Practice and Remedies Code Section 74.351, or alternatively that there is no evidence he was negligent. The Court disagrees.

**Analysis**

**I.     Summary Judgment — Legal Standard — Generally**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the

nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

**II.     Travis County's Motion for Summary Judgment [#55]**

**A.     Section 1983**

**1.     Municipal Liability — Legal Standard**

Municipalities and other local government bodies, such as counties, may be sued under § 1983. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). However, such an entity may not be held liable under the theory of respondeat superior, and thus "may not be held liable under

§ 1983 solely because it employs a tortfeasor." *Id.* A local government entity can only be held liable under § 1983 if a plaintiff can "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.*

A deprivation is pursuant to a "policy" when it "result[s] from the decisions of [the municipality's] duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 403–04. "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404. "A policy or custom is official only when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Although "there is no 'de facto' final policymaking authority," *id.*, in Texas "[t]he sheriff is without question the county's final policymaker in the area of law enforcement." *Colle v. Brazos Cty., Tex.*, 981 F.2d 237, 244 (5th Cir. 1993).

"Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving . . . issues of fault and causation is straightforward." *Brown*, 520 U.S. at 404. However, where a plaintiff attempts to impose liability upon a municipality for a facially lawful action that has led an employee to violate the plaintiff's rights, the plaintiff must demonstrate the municipal action was taken with deliberate indifference to known or obvious consequences. *Id.*

"Deliberate indifference" is a "stringent standard of fault," beyond "simple or even heightened negligence." *Id.* at 407, 410. The Fifth Circuit has emphasized this point: "'Deliberate

indifference' implies a sense of callousness and is treated . . . as tantamount to intent . . . ." *Thompson v. Connick*, 578 F.3d 293, 298 (5th Cir. 2009).  Further, the policy or custom must be the "moving force" behind the violation of the plaintiff's rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

The Fifth Circuit has summarized these requirements in the following way: "The three attribution principles identified here—a policymaker, an official policy and the 'moving force' of the policy—are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578.

## 2.    Application

Here, Jackson has failed to identify any official Travis County policy or custom that directly led to a deprivation of Ms. Jackson's constitutional rights.  Indeed, viewing the facts above in any reasonable light, there is a genuine dispute of material fact about whether Ms. Jackson's death was directly caused by the failure of various Travis County employees to follow established policies.  For instance, if information about Ms. Jackson's rapid heartbeat and difficulty breathing had been recorded by TCCC staff, and conveyed to Dr. Ford— as required by Travis County policy—Ford testified he would not have prescribed Mellaril to Ms. Jackson without first investigating her medical condition.  Moreover, if TCCC staff had actually verified Ms. Jackson was alive and responsive during their periodic "post visuals," also as required by Travis County policy, they may have detected her distress early enough to save her life.

The only plausible argument Jackson makes regarding Travis County's liability under § 1983 is that pharmacy supervisor Diana Gonzalez, who was responsible for the decision not to inform

doctors except in the case of "level 1" interaction warnings, was Travis County's policymaker in the area of filling prescriptions for inmates. However, Jackson provides no evidence that Gonzalez had the final policymaking authority in this area, while Travis County provides evidence that she was not. Indeed, it seems unlikely Gonzalez was the last word in Travis County when it came to prescriptions for inmates, and her decisions could not be overruled by, for instance, the County Sheriff.

3.      **Conclusion — Travis County — Section 1983**

In short, the facts of this case, viewed in the light most favorable to Jackson, do not create any genuine dispute about whether Ms. Jackson's death was directly caused by an official Travis County policy or custom. While the mistakes made by Travis County employees may not speak well of their competence and professionalism, they cannot fairly be identified as the official actions of the government of Travis County; nor, even if they could, do they demonstrate Travis County's deliberate indifference to known or obvious consequences. Accordingly, the Court grants Travis County's motion for summary judgment on Jackson's § 1983 claim.

B.      **Negligence**

As the facts and discussion above make obvious, the evidence, viewed in the light most favorable to Jackson, creates a genuine dispute of material fact about whether various Travis County employees failed to act with ordinary care under the circumstances. The only question is whether Travis County enjoys sovereign immunity regarding Jackson's negligence claims. For the following reasons, the Court concludes it does not.

1.      **Texas Tort Claims Act (TTCA)**

" [I]n Texas a governmental unit is immune from tort liability unless the Legislature has

-17-

waived immunity." *Dallas Cnty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998). "The Tort Claims Act provides a limited waiver of sovereign immunity, allowing suits to be brought against governmental units only in certain, narrowly defined circumstances." *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). Among these circumstances are those described by Texas Civil Practice and Remedies Code Section 101.021, which states in part: "A governmental unit in the state is liable for . . . personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law."

## 2.    Application

Travis County argues it enjoys sovereign immunity regarding Jackson's negligence claims. However, the weakness of Travis County's position is made apparent by the many twisted and cumbersome arguments the county advances in support of it. Indeed, based on the facts recited above, it is difficult to see how Travis County can argue with a straight face that Jackson's claims do not fall under Texas Civil Practice and Remedies Code Section 101.021.

Viewing the evidence in the light most favorable to Jackson, there is at least a genuine dispute of material fact whether Ms. Jackson's death was proximately caused by a severe negative interaction between Mellaril and Risperdal, which interaction was potentially aggravated by her hypokalemic state. The evidence is undisputed these drugs were prescribed by a contractor of Travis County, filled by an employee of Travis County even though she knew of the potential risk, and administered to Ms. Jackson by other employees of Travis County.

Moreover, there is a genuine dispute of material fact whether Travis County subsequently failed to use reasonable care to correct its mistake, or to minimize the injury to Ms. Jackson. When

Ms. Jackson began to experience distress potentially related to the drug interaction, employees of Travis County may have failed properly to document her complaints, or relay them to appropriate medical personnel. Likewise, Travis County employees may have failed to perform periodic checks on Ms. Jackson, when such checks might plausibly have saved her life.

If a citizen of Texas knowingly gave a dangerous combination of drugs to another person, then effectively ignored that person's medical distress until the person died,[9] a negligence claim would likely be the least of that citizen's liability concerns. Because Ms. Jackson's death appears to have been caused by the use of tangible personal property, namely Mellaril and Risperdal, and because there is at least a plausible argument Ms. Jackson's death was proximately caused by the negligence of Travis County employees, the Court concludes Jackson's cause of action falls under Texas's limited waiver of sovereign immunity, specifically that contained in Texas Civil Practice and Remedies Code Section 101.021(2). The Court therefore rejects Travis County's argument on this point.

The Court only briefly mentions a second argument advanced by Travis County, that Jackson's negligence causes of action must be dismissed for her failure to comply with the expert report requirements of Texas Civil Practice and Remedies Code Section 74.351—an argument Ford makes also, in his motion for summary judgment.

This is a meritless argument, and one which the undersigned has explicitly rejected in the past. *See Garza v. Scott & White Mem'l Hosp.*, 234 F.R.D. 617, 623 (W.D. Tex. 2005) ("[T]he Court holds § 74.351 of the Texas Civil Practice and Remedies Code has no application in federal

---

[9] Although it is questionable whether any *single* Travis County employee had knowledge of both the drug interaction risks and Ms. Jackson's subsequent medical distress, there is sufficient evidence that Travis County, as an entity, did have such knowledge.

court."). Indeed, it is difficult to understand how a Texas procedural requirement—and the Court digresses briefly to note Subchapter H of Chapter 74, in which this provision appears, is entitled "Procedural Provisions"—is applicable to any case in federal court, much less a federal case such as this, which was based on this Court's "federal question" jurisdiction.[10]

The thin reed keeping this argument from being wholly frivolous, and potentially subjecting both Travis County and Ford to sanctions, is Ford's citation to the Fifth Circuit's unpublished opinion in *Chapman v. United States*, 353 F. App'x 911 (5th Cir. 2009) (unpublished). In *Chapman*, the Fifth Circuit affirmed the district court's grant of summary judgment in favor of the United States on Chapman's medical malpractice claim brought pursuant to the Federal Tort Claims Act. *Chapman*, 353 F. App'x at 912. In its analysis, the Court noted Chapman's failure to file an expert report, as required by § 74.351. *Id.* at 913–14.

However, *Chapman* is not controlling here, for two reasons. First, and most obvious, is the fact *Chapman* is an unpublished opinion, and therefore not binding on this Court. Second, and equally important, is that *Chapman* is factually distinguishable from this case. In *Chapman*, the district court granted summary judgment against Chapman because he failed to designate any expert witnesses, and the court "could not ascertain the standard of care, or any breach of that care, without expert testimony." *Id.* at 912. Thus, Chapman's failure to file an expert report was not simply a procedural oversight, but instead wholly deprived the district court of any substantive evidentiary basis to deny the government's motion for summary judgment. By contrast, on March 14, 2011, Jackson filed her designation of expert witnesses, naming Dr. Priscilla Ray as a testifying expert, and

---

[10] Indeed, the Court questions whether this Texas law, which is more akin to a severe sanction than a procedural requirement, would survive federal constitutional scrutiny in *any* case.

providing a summary of her anticipated testimony, in compliance with the Court's scheduling order. Jackson likewise listed as potential expert witnesses Travis County chief medical examiner Dr. David Dolinak, and TCSO pharmacist Diana Gonzalez.

Nor does the Court find *Chapman* persuasive, under the facts of this case. In addition to the differences noted above, the Court simply finds no reason to apply Texas procedural law to a federal lawsuit, particularly one based on the Court's federal question jurisdiction. Even if *Chapman* stands for that seemingly remarkable proposition—a point on which the Court has some doubt—the case contains no explanation why it would be appropriate to do so; and, given the draconian nature of the Texas rule, under which a plaintiff's medical malpractice claim must be dismissed with prejudice if the plaintiff fails to adhere to the rule's arcane disclosure requirements, the Court is disinclined to apply it without explicit direction from the Fifth Circuit. The Court thus declines to depart from its prior decision in *Garza*, and rejects Travis County's arguments on this issue.

**3.      Conclusion — Travis County — Negligence**

For the foregoing reasons, the Court rejects Travis County's arguments regarding Jackson's negligence claims, and consequently denies Travis County's motion for summary judgment as to those claims.

**III.    Ford's Motion for Summary Judgment [#52]**

**A.      Section 1983**

**1.      Right to Reasonable Medical Care — Legal Standard**

"[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001).

-21-

"Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: 1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; 2) the official actually drew that inference; and 3) the official's response indicates the official subjectively intended that harm occur." *Id.* at 458–59. However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Accordingly, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459.

**2.      Application**

Here, Jackson's § 1983 claim against Ford fails because there is little or no evidence Ford (1) was aware of facts from which an inference of substantial risk of serious harm to Ms. Jackson could be drawn; (2) that he actually drew that inference; or (3) that his response indicated he subjectively intended Ms. Jackson's death to occur.

To be sure, there is evidence Ford knew that Mellaril could, alone or in combination with other drugs, cause cardiac difficulties for patients. *See, e.g.*, FMSJ, Ex. A ¶ 10. However, Ford stated he had "prescribed Mellaril to numerous patients for 40+ years without any adverse cardiac consequences, and [he] did not believe Ms. Jackson fit into a category of patients for whom [he] would have cardiac concerns." *Id.* ¶ 9. Accordingly, although Ford was obviously aware of *some* risk to Ms. Jackson's health in prescribing her Mellaril, there is insufficient evidence he was aware of facts from which an inference of a *substantial* risk of serious harm could be drawn. This is especially true in light of the undisputed evidence that Ford was never notified about Ms. Jackson's rapid heartbeat, difficulty breathing, or hypokalemic state. To the extent Jackson argues Ford should

-22-

have learned of these facts through more diligent investigation, her claim is one for negligence, not a constitutional violation. Likewise, there is no evidence in the record suggesting Ford actually drew the inference that his prescribing Mellaril to Ms. Jackson would pose a substantial risk of serious harm to her, nor whether his subsequent actions demonstrated a subjective desire for such harm.

**3.      Conclusion — Ford — Section 1983**

Deliberate indifference is a very high standard, requiring awareness of relevant facts, actual appreciation of the harm likely to result from them, and a subjective indifference to that harm. It is a mental state that implies callous detachment, not mere carelessness. There is no genuine dispute of material fact whether Ford acted with such a culpable mental state in this case. Accordingly, the Court grants Ford's motion for summary judgment on this issue.

**B.      Negligence**

The Court need not address at length Ford's arguments about Jackson's negligence claims. As noted at the outset, Ford's first argument is that Jackson's negligence claims should be dismissed for failure to comply with Texas's expert report requirement. The Court has already considered and rejected this argument in the context of Travis County's motion for summary judgment.

Ford's second argument is that there is simply no evidence he acted negligently. However, as noted above, Ford was aware of the risks associated with Mellaril. Moreover, there is evidence he knew, or should have known, that Mellaril was more dangerous when combined with Risperdal, particularly in the context of a hypokalemic patient. Whether Ford should have know Ms. Jackson was hypokalemic, and whether he should have discovered Ms. Jackson's post-Mellaril distress, are closer questions, but they should be answered by a jury, not this Court.

Accordingly, the Court rejects Ford's arguments regarding Jackson's negligence claims, and

denies his motion for summary judgment on these claims.

## Conclusion

In summary, the Court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment. Specifically, the Court grants Defendants' motions on Jackson's § 1983 claims, and denies them on her negligence claims. Although this leaves only Texas state law causes of action, and the Court is mindful of the general rule in this Circuit, that state law causes of action should generally be dismissed when all federal claims have been disposed of prior to trial, *see Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992), the Court finds the exercise of supplemental jurisdiction is appropriate in this case, in light of the advanced stage of the proceedings, the time and money already expended by the parties, and the imminence of trial.

Specifically, the events underlying this case occurred in July 2008, the lawsuit itself was filed in July 2010, and Jackson's claims are set for trial in a matter of weeks. Under these circumstances, it would be wasteful in the extreme for this Court to dismiss Jackson's state law claims on the eve of trial, and to force her to start the entire process over again in state court.[11]

Accordingly,

IT IS ORDERED that Plaintiff Regina Jackson's Motion for Leave to File First Amended Complaint [#42] is DENIED;

---

[11] It appears Jackson's claims would still be viable in state court, the limitations period having been tolled by Texas Civil Practice and Remedies Code Section 16.064. *See, e.g., Vale v. Ryan*, 809 S.W.2d 324, 327 (Tex. App.—Austin 1991, no pet.) ("[F]or purposes of the applicability of section 16.064, a federal court's refusal to exercise jurisdiction over a pendent state claim is tantamount to a dismissal for lack of jurisdiction."). However, trial of Jackson's claims would surely be substantially delayed if brought in state court, and the expense to her needlessly increased, all to no practical effect: it appears Jackson would be able to satisfy, in a timely fashion, all applicable Texas procedural requirements, including the expert report disclosure requirement discussed earlier in this opinion. Thus, dismissing Jackson's state law claims would simply act to delay the trial of this cause, and would promote no significant state interest.

IT IS FURTHER ORDERED that Defendant John S. Ford's Motion for Summary Judgment [#52] is GRANTED IN PART and DENIED IN PART, as described in this opinion;

IT IS FURTHER ORDERED that Defendant Travis County, Texas's Motion for Summary Judgment [#55] is GRANTED IN PART and DENIED IN PART, as described in this opinion;

IT IS FURTHER ORDERED that Jackson's Motion to Take the Oral Deposition of Russell Marburger [#60] is DENIED;

IT IS FURTHER ORDERED that Jackson's Motion for Leave to File Surreply [#45] is GRANTED;

IT IS FINALLY ORDERED that Travis County's motions to dismiss [#34] and to quash [#62] are DISMISSED WITHOUT PREJUDICE as moot.


SIGNED this the 5th day of December 2011.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE